FORM TO BE USED BY PRISONERS IN FILING A COMPLAINT
UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. §1983

**FILED**

JAN 3 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE

# United States District Court

*JURY ACTION*

LAWRENCE DAVIS, Jr.

Reg. No. 13158-007

FCI-Cumberland, P.O. Box 1000

Cumberland, Maryland 21501-1000

*(Enter above the full name of the plaintiff or plaintiffs in this action.)*

CASE NUMBER  1:07CV00200

JUDGE: Emmet G. Sullivan

DECK TYPE: Pro se General Civil

DATE STAMP: 01/30/2007

V.

**COMPLAINT**

District of Columbia, Department of Corrections;

District of Columbia Mayor; Anthony Williams

Correctional Corporation of America; Warden of Corr. Corp. of America;

Dr. Wright, Correctional Corp. Of America, Physician; Diamond Pharmacy;

*(Enter above the full name of the defendant or defendants in this action.)* Warden Fred Figeuora,          et.al.

**A.** Have you begun other actions in state or federal court dealing with the same facts involved in this action or otherwise relating to your imprisonment?

Yes ( )    No ( X )

**B.** If your answer to A is yes, describe the action in the spaces below. (If there is more than one action, describe the additional actions on the reverse side of this page.)

1. Parties to the action: _____

2. Court (if federal court, name the district; if state court, name the county): _____

   _____

3. Docket number: _____

4. Name of judge to whom case was assigned: _____

   _____

5. Disposition (for example: Was the case dismissed? Was it appealed? Is it still pending?): _____

**RECEIVED**

JAN 1 7 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1

C. 1. Did you present the facts relating to your complaint in the state prison grievance procedure?

Yes ( ✓ )    No ( )

2. If your answer is yes, what was the result? _CONTINUED NEGlect MEDICAlly_ _AND FAiLuRE TO REMEDY ITs OWN INStitUtioNAL PoliCy_ _AND PROCEEDURES OF WHICH IVE EXHAUSTED._

3. If your answer is no, explain: _____

_____

_____

## PARTIES

(In item I below, place your name in the first blank and place your present address in the second blank. Do the same for additional plaintiffs, if any.)

I.  Name of plaintiff __Lawrence Davis, Jr.__

Address Reg. No. 13158-007, Federal Correctional Institution, P.O. Box 1000, Cumberland, Maryland 21501-1000

(In item II below, place the full name of the defendant in the first blank, his official position in the second blank, and his place of employment in the third blank. Use the space below item II for the names, positions, and places of employment of any additional defendants.)

II. Defendant __District of Columbia, D.C. Jail__ is employed as _____

Department of Corrections __ at __1923 Vermont Avenue, N.W.__

Washington, D.C. 20001 (202)671-2042

and, Correctional Corporation of America.

## STATEMENT OF CLAIM

III. State here as briefly as possible the facts of your case. Describe how each defendant is involved. Include also the names of other persons involved, dates, and places. Do not give any legal arguments or cite any cases or statutes. If you intend to allege a number of different claims, number and set forth each claim in a separate paragraph. (Use as much space as you need. Attach extra sheet if necessary.)

_____

### SEE ATTACHED "STATEMENT OF CLAIM"

_____

_____

_____

_____

## STATEMENT OF CLAIM

LAWRENCE DAVIS, Jr., Plaintiff, sustained injuries and damages as the result of improper and inadequate medical care, treatment, and attention rendered to him, Plaintiff Lawrence Davis, Jr.

Mr. Davis arrived at the D.C. Jail, Central Detention Facility, specifically cell 59, on September 5, 2001.  When Mr. Davis arrived and continuing throughout his entire stay at the District of Columbia Jail, Mr. Davis made repeated and daily complaints about his left foot problem.  This problem had started while he was incarcerated in the Virginia prison system and continued unabated after his arrival at the D.C. Jail.  He made requests orally, by placing his name on the sick call via Inmate medical Request forms on almost a daily basis.  On or about October 8, 2001, Mr. Davis was transferred to the Lorton Reformatory (also operated by the District of Columbia Department of Corrections) where he was housed in Dormitory 20.

His condition continued to worsen despite requests for medical care and treatment, both orally and in writing, Mr. Davis continued to receive inadequate and improper medical care and treatment. Then on November 10, 2001, the Lorton Reformatory was closed and he was transferred back to the D.C. Jail with his condition worse than it had ever been.  Mr. Davis remained there until he was sent and hospitalized from December 11, 2001 at the Greater Southeast Community Hospital; being released on the same day, December 11, 2001, and taken to the Correctional Corporation of America Treatment Facility.

Mr. Davis would be held at the Correctional Corporation of America Treatment Center, then be taken to the Greater Southeast

statement of claim

Community Hospital for a short stay, then be returned to the Correctional Corporation of America (CCA) Treatment Center.

By February 9, 2003, Mr. Davis' condition had become so severe that he was transferred to the Medical Center for Federal Prisoners at Springfield, Missouri, where he received the proper treatment and care. Mr. Davis was released from the Medical Center at Springfield, on October 23, 2003, and was transferred to his current institution of incarceration at Cumberland, Maryland.

Mr. Davis claims that the District of Columbia Department of Corrections and the Correctional Corporation of America, acting through its agents, servants, and employees within the scope of their employment, provided Mr. Davis with inadequate and improper medical care and treatment, failed to have proper medication available, failed to make proper referrals to competent persons, failed to diagnose his condition, failed to have proper medical equipment to test and determine the nature and extent of his condition, failed to properly hire, train, and supervise medical personnel, failed to diagnose his condition in a timely manner and other acts of improper medical treatment. In addition, the District of Columbia failed to provide proper care, safekeeping and protection as required by the laws of the District of Columbia and failed to follow normal and proper penological practice.

Also, the District of Columbia and Correctional Corporation of America, through its agents, servants and employees acting within the scope of their employment violated his civil and constitutional rights, acted in a cruel and deliberately indifferent manner towards Mr. Davis' serious medical condition and otherwise aggravated and

2

statement of claim

worsened his medical condition.

As a direct and proximate result of any;or all of the aforesaid, Mr. Davis, suffered physical pain, mental anguish, the distinct possibility that he may lose his left foot, embarrassment, shame, humiliation, a deterioration of his overall health, extreme psycholog-ical injury, an inability to perform his normal and usual activities, loss of long term earning capacity, hospitalizations, the need for continuing and proper medical care and treatment, as well as other injuries and damages which at this time are not fully known.

In addition to all of the aforesaid, Lawrence Davis, Jr. and his wife, Kimberly Davis, suffered loss of consortium including a loss to their normal and usual marital activities and a detriment to their marriage.

The Defendants in their respective duties and obligations failed to provide the care needed to fulfill their responsiblities in the medical care of Mr. Lawrence Davis, Jr.; which, included the failure to provide the medications and supplies which Diamond Pharmacy were responsible to deliver to Correctional Corporation of America; which, the District of Columbia, Department of Corrections were obligated to provide; which, Correctional Corporation of America was contracted to provide; which, Dr. Wright was contracted to provide; and other Staff of the DC Department of Corrections, Correctional Corporation of America, and Diamond Pharmacy failed in their respective respon-sibilities.

RELIEF

IV. State what relief you seek from the court. Make no legal arguments. Cite no cases or statutes.

Mr. Lawrence Davis, Jr., Plaintiff, respectfully request

relief from the District of Columbia, Department of Corrections,

and Correctional Corporation of America, Diamond Pharmacy, Warden

Fred Feguoar, Mayor of District of Columbia, Dr. Wright, et. al., pay

in the sum of $5 million ($5,000,000.00) total, for actual and punitive

damages.

Signed this ___12th___ day of ___JANUARY 2007___

,Reg No. 13158-007

FCI-Cumberland, P.O. Box 1000

Cumberland, Maryland 21501-1000

*(Signature of plaintiff or plaintiffs)*

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___January 12, 2007___
*(date)*

___Lawrence Davis Jr___
*(Signature of Movant)*

This is to verify that Mr. Davis has initiated the process of this complaint and he is incarcerated at FCI Cumberland, MD.:

NAME _S. Gobel_ TITLE _Case Manager_
AUTHORIZED BY THE ACT OF JULY 7, 1955 TO
ADMINISTER OATHS (18 USC 4004). 11/27/06

IN THE
DISTRICT OF COLUMBIA SUPERIOR COURT
CIVIL DIVISION

LAWRENCE DAVIS, Jr.,                    :
                                        :
                    Plaintiff,          :
                                        :
            -vs-                        :    CASE NO._____
                                        :
DISTRICT OF COLUMBIA, Dept. of          :
Corrections;                            :
DISTRICT OF COLUMBIA MAYOR WILLIAMS;    :
CORRECTIONAL CORPORATION OF AMERICA;    :
WARDEN FRED FIGUEROA OF CORRECTIONAL    :
CORPORATION OF AMERICA;                 :
DR. WRIGHT, Correctional Corp. of       :
America Physician,                      :
DIAMOND PHARMACY;   et.al.,             :

                    Respondents.

                    ─────────────────

MEMORANDUM IN SUPPORT OF CLAIM FOR
DAMAGES DUE TO NEGLIGENCE OF RESPONDENTS

    NOW COMES, Lawrence Davis, Jr.,  Plaintiff, pro se, to submit

Memorandum in Support of Civil Action in this Honorable Court, seeking

actual and punitive damages from the above defendants (respondents),

and others, for the negligence and malpractice to Mr. Davis, Plaintiff;

while he was in their care during a period of incarceration.  Plaintiff

respectfully request the Court hold this memorandum to a less stringent

standard due to it being prepared by a pro se plaintiff.  (See Haines

v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 562 (1972))

    Plaintiff, presented to the District of Columbia, Department

of Corrections (DC Jail), from State of Virginia Prison, September 5,

2001, with a blister like sore on the heel of the sole of

the left foot.   Mr. Davis, then went through an intake medical

07 0200
**FILED**

JAN 3 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

evaluation and screening.  September 8, 2001, Mr. Davis received
a Urgent Care Office visit with provider, Dr. Fidelis Doh, MD, where
Mr. Davis had a dressing change of "ulcer located on plantar aspect
of heel." (See Lorton App. Pg. 5).  On September 14, 2001, Mr. Davis
(Patient) was seen by Karen D. Harrison, DPM, at intake medical,
where a history of Patient was taken, and a treatment plan was ordered
for care of the "ulcer" of the heel.  (See Lorton App. Pg. 6)  On
September 18, 2001, Patient again saw Dr. Karen D. Harrison, whom
noted a "serous discharge noted" with "some healing occurring since
debrided 4 days ago", and noted Patient "ambulating with cane."  The
Doctor ordered for continued debridement with wet to dry saline dress-
ing.  (See Lorton App. Pg. 9)  Patient was then debrided by Dr. Harri-
son again on September 21, and September 25, where patient was assessed,
"Ulceration slowly healing.  Suggest Gallium scan to see extent of
osteomyelitis to assess healing potential based on findings mentioned
in last note."  (See Lorton App. Pg. 11)  On September 28, Patient
seen by Dr. Harrison, whom noted "ulceration healed slightly with
some bogginess" assessing "cellulitis lower extremity left which
may have occurred from flair up of osteomyelitis."  The Dr. gave
the antibiotic Rocephin 1gram stat.  (See Lorton App. Pg. 12) On
October 2 and October 9, Dr. Harrison assessed Patient noting "healing
very slowly, will pack with plain nuguaze to ensure no pockets of
infection present and  order gallium plan: packing with plain nuguaze
then wet to dry saline dressing."  (See Lortan App. Pg. 14)  Then
October 16, Dr. Harrison saw Patient, assessing "Osteomyelitis at
calcaneus appears to affecting the healing potential of this ulcer...
Still skeptical of healing potential of this ulcer because of time

2

present and infection apparent.  Patient aware of possibility of

amputation."  Then continued to order "Nuguaze packing-plain to ulcer

with wet to dry saline dressing applied."  (See Lorton App. Pg. 17)

November 16, 2001, Patient seen by Dr. Karen Harrison, DPM, where

Dr. Harrison noted "Ulceration still has not healed,  and notes her

doubts to claim that soaking of wound was done while at another

institution.  Dr. Harrison states, "Which strongly disagree with."

(See Lorton App. Pg. 23)  Dr. Harrison concludes with a plan for

Greater Southeast Hospital to give another opinion.

In Sum, While Patient Davis was seen at the Lorton Medical Facility

of the District of Columbia Dept. of Corrections, he did receive

debridement and wet to dry dressing changes, which were to be continued,

and only received one dose of the antibiotic Rocphin 1gram.  Though

Mr. Davis was seen on different occasions at the Lorton Medical Facility,

his primary custody was at the D.C. Jail Facility.  So, Dr. Harrison

saw him at Lorton Medical, then Mr. Davis would be taken back to

the D.C. Jail for confinement, and to receive the daily treatment

plan that Dr. Harrison has ordered, which was the packing with plain

nuguaze then wet to dry saline dressing changes.  **This plan was not

cared out by the D.C. medical staff**, or by any other staff, on a

regular daily basis.  As Dr. Harrison noted on November 16, 2001,

"strongly disagree", the Dr. could apparently see from the condition

of the ulcerated heel  that the daily treatment was not being done.

Thus, the D.C. Jail was being negligent in their duties of care for

Mr. Davis, acting with gross indifference, amounting to malpractice.

The D.C. Jail violated Mr. Davis's United States Constitutional

Right to be protected from cruel and unusual punishment, violating

3

the 8th amendment, showing deliberate indifference, showing a sub-standard of decency, and showing an unnecessary and wanton infliction of pain. Mr. Davis posits the D.C. Jail was under staffed, which added in the showing of deliberate indifference. (See Anderson v. City of Atlanta, 778 F.2d 678, 686 (11th Cir. 1985) finding "inadequate staffing leading to deliberate indifference." Then, in Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982) a failure for opportunity to make sick call, or voice medical concern, was deliberate indifference.

Herein, Mr. Davis was not being taken for daily dressing changes and treatment plan, as ordered by Dr. Harrison from the Lorton Medical Facility of DC Dept. of Corrections. Also, Mr. Davis received only one dose of antibiotic, Rocephin 1gm, September 28, 2001, while at Lorton Medical, which constitutes a less effective and less costly treatment, than being administered regular doses of antibiotic. The daily treatment plan of Dr. Harrison was necessary, additionally, Dr. Harrison should have treated Mr. Davis with additional antibiotics, no matter the cost of those antibiotics. A less than effective treatment was being used on Mr. Davis' ulcerated heel. And, Dr. Harrison ordered no cultures. (See West v. Keve, 571 F.2d 158, 162 (3rd Cir. 1978)); Woodall v. Oti, 648 F.2d 268, 272 (5th Cir. 1981.

Lorton Medical Facility closed in November, 2001; Mr. Davis' care was then from Correctional Corporation of America (CCA) and Greater Southeast Community Hospital, where the District of Columbia Department of Corrections maintained contracts for medical care of their inmates, such as Mr. Davis.

Mr. Davis had been seen for a diagnosis as the Southeast Hospital on October 29, 2001, where Dr. Maurice McCreary ordered a NM Bone

4

Three Phase, and determined Mr. Davis to have osteomyelitis of the inferior posterior left calcaneal bone. (See Greater Southeast App. Pg. 1)

Mr. Davis was admitted to Southeast on December 11, 2001, where on December 13, 2001 a speciman was collected for a microbiology report from the Southeast Pathology Laboratory. The final report was made on December 18, 2001 with a finding of light growths of "staphylococcus aureus and providencia stuartii." (The report included a chart showing the susceptibility of these organisms, that were infecting Mr. Davis' heel.)

Also, December 11, 2001, a Report of History and Physical Examination was prepared, which included a treatment plan-to be a IV dose of the antibiotic Unasyn 1.5 grams every 6 hours; including continued daily dressing changes with cleaning of the wound. Note, Dr. Harrison at Lorton Medical had only given one dose of an antibiotic (Rocephin 1gram) but immediately upon admittance to Southeast Hospital, Dr. McCreary, of Southeast, ordered Unisyn 1.5 grams IV every 6 hours.) (See Southeast App. Pg. 3)

Additionally, December 11, 2001, Mr. Davis received a debridment of left heel draining osteomyelitis, and placement of a port-a-cath in the left internal jugular vein. (Southeast App. Pg. 4).

December 20, 2001, Mr. Davis was discharged from Southeast to Correction Corporation of America, which was under contract with the D.C. Department of Corrections. The discharge included orders for Mr. Davis to receive IV doses via port-a-cath of Unasyn 3grams every 8 hours (three times daily), and with special instructions

for daily dressing changes and cleaning, to include packing with 1/2" Mesalt wrap and Kling, of the left heel.  (See Southeast App. Pg. 5)   Dr. McCreary's order for the Unasyn "was for a long term basis."  (See Southeast App. Pg. 6)

On January 2, 2002, while at the Correctional Corporation of America (CCA), Mr. Davis only received a one time dose of 1.3 grams of Unasyn, where he had been ordered to receive 3 grams (three times daily) by Dr. McCreary, when discharged from Southeast.

On January 3, 2002, Mr. Davis receive NO Unasyn doses from the CCA staff.

On January 4, 2002, Mr. Davis was transferred back to Southeast, where he received the proper medication, a port a cath needle replacement, and the daily dressing changes.

On January 8, 2002, Mr. Davis was transferred back to CCA.  On this date at CCA, Mr. Davis did not receive any Unasyn IV doses.

On January 9, 2002, at CCA, Mr. Davis only received (1) 3 gram dose of Unasyn, and a 1.3gram dose of Unasyn.  The third dose was not administered.

On January 10, 2002, a Dr. Chalondry, under contract with CCA, ordered Mr. Davis to be taken off the Unasyn antibiotic and placed on oral Cipro 500mg twice daily.  Mr. Davis only received two doses of the Unasyn on the 10th, before it was discontinued.  Dr. McCreary of Southeast Hospital, had not been asked his opinion about the change of antibiotics

On January 11 and January 12, Mr. Davis suffered extreme side-effect of loose bowels, over bearing stomach cramps, rectal bleeding,

6

and was vomiting yellow, green fluid. Mr. Davis, therefore refused the next two doses of IV medication that staff of CCA wanted to administer. Mr. Davis is not sure the contents of those two bags of IV fluid administered on January 10, but he posits those two bags caused the extreme side effect condition.

Noted on the Southeast Pathology Laboratory Report, (See Southeast App. Pg. 2) a susceptibility testing shows the two bacteria found in Mr. Davis' wound to be Staphylococcus Aureus and Providencia Stuartii, plus an unnamed light growth gram negative rods. These bacteria are not not susceptible to Cipro (ciprofloxin), according to the susceptibility chart that Southeast Hospital Pathology Laboratory prepared.

On January 25, 2002, Dr. Wright, contract physician for CCA, told Mr. Davis, she had filed a complaint with the CCA Administrators in the Medical Contractors Office, about the neglect he had been receiving from CCA, for the failure of CCA Staff to fill and administer the medical orders, and their failure to fulfill the transportation request (to take Mr. Davis for scheduled appointments at Southeast Hospital). Then, on January 28, 2002, after missing several Southeast Hospital appointments, due to CCA's failures to transport, Mr. Davis received a Bone Scan at Southeast Hospital.

On January 31, 2002, Dr. Chalandry discontinued the Cipro and ordered a daily dose of Levaquin 500mg for 8 weeks (orally). Levaquin "levofloxacin" is on the Southeast Pathology Susceptibility Testing Chart; and is effective on Providencia Stuartii Bacteria. (See Southeast App. Pg. 2). Note, Dr. McCreary's order for Unasyn was **not** being filled.

February 1, 2002, Mr. Davis did not receive a dressing change

7

during the day shift, though he asked repeatedly, Nurse Green did place the bandages and mesalt in Mr. Davis' room at 2pm, but she did not change the dressing.

February 3, 2002, CCA nurses Ross and Sharp, told Mr. Davis that all medications had been discontinued. Then at 3a.m. February 4, 2002, CCA Mr. Singley awoke Mr. Davis, transported him to the transportation department of CCA, and had him transported to the D.C. Jail, where Mr. Davis was transported to the Harrisonburg, Pennsylvania Airport. After several hours of waiting at the Harrisonburg Airport, the U.S. Marshalls asked for the transfer papers for Mr. Davis. Not finding any transfer papers, the U.S. Marshalls then took Mr. Davis back to the D.C. Jail, where Mr. Davis went through the intake process. This process was taking place at 7:30a.m. February 5, 2002. Thereby, throughtout this ordeal, from being taken off his medication on February 3, until February 5, 2002, Mr. Davis did not receive any medication or dressing changes. Mr. Davis was not scheduled to be transferred, therein there was no reason for the D.C. Jail, Department of Corrections, to place Mr. Davis on a bus to Harrisonburg, Pennsylvania for a transfer.

February 6, 2002, Mr. Davis requested new socks from Nurse Johnson at CCA, because Mr. Davis had been changing socks twice daily, washing them out, keeping his foot clean, because the daily bandage changes are not being performed. Then, spoke to Dr. Wright about not getting the daily bandage change.

February 12, 2002, Mr. Davis was transferred from CCA to Southeast, where he saw Dr. McCreary. Dr. Wright had requested Dr. McCreary

8

remove the port-a-cath. (Note, CCA had not been administering the
IV antibiotic Unasyn.)  INSTEAD, Dr. McCreary stated that he was
going to contact Mr. Davis' Lawyer about the negligent care from CCA,
and that he was **not going to remove the port-a-cath.**  Dr. McCreary
reviewed the treatment plan with Mr. Davis, which included "extensive
intravenous antibiotics, a bone cut out of the heel, debridement of
left heel, and hospitalization."

On February 13, 2002, after returning to CCA, Nurse Green refused
to change and clean the dressing, choosing instead to provide the
bandages and MeSalt, telling Mr. Davis to"change the dressing himself."
Fortunately, the nurse did flush the port-a-cath.  Mr. Davis was
receiving the once a day dose of Levaquin 500mg (antibiotic).

Until February 19, 2002, Mr. Davis had been receiving a dose
of Tylenol No. 3 (with Codeine) or a dose of Percocet, for pain. On
this day, Mr. Davis was given Liquid Tylenol with Codeine, because
CCA had run out of the tablet form.  (Note, Liquid Tylenol did not
relieve the pain, possibly due to the Liquid form containing half
the strength of Codeine as the tablet form of Tylenol No. 3.)  Then,
February 20, 2002, Nurse Green informed Mr. Davis that the Vitamin A
would no longer be given, because CCA had run out.  Instead, a Multi-
Vitamin would be administered. (Note, Multi-Vitamins contain far less
Vit. A than Vitamin A Capsules that contain no other vitamins.)

February 22, 2002, Nurse Evelyn (CCA) told Mr. Davis that he
had received his Tylenol No. 3 tablet; but, Mr. Davis had not.  Then,
again on February 24, 2002, he received no pain medication; and,
on February 25, 2002, no Tylenol No. 3 was administered.

9

February 27 and 28 of 2002, Mr. Davis supposedly received doses of Persocet for pain, but Mr. Davis felt no effect, suffering with severe pain.  From February 19 thru the 28th, no Tylenol was provided. (Tylenol No. 3 tablets).  At 6:30pm February 28th, Nurse Taylor administered a 3gram dose of IV Unasyn, and at 12pm another dose of Unasyn was administered.

Seen from the aforementioned events of February 2002, Mr. Davis continued to suffer from the negligence of the CCA Staff and the Staff of the DC Department of Corrections; both from their failure to provide needed medication, needed medical treatment, and a non-ordered trip to Harrisonburg, Pennsylvania (taken from Mr. Davis' hospital bed at CCA and made to travel on a bus for many hours, entailing being taken off his medicine February 3, 2002 through the morning of February 5, 2002.

In sum, Mr. Davis admitted to Southeast Hospital December 11, 2001, where he was found to be infected with staphylococcus aureus and providencia stuartii.(See Southeast App. Pg. 2)  A "Transfer Summary" was prepared on December 19, 2001, and signed by Dr. Maurice McCreary, Southeast Hospital, which stated the results of the cultures taken at the hospital and the resistance of these organisms."It revealed Staphyloccus Aureus was resistant to erythromycin and tetracycline. A second organism grew as Providencia Stuartii, which was resistant to cefazolin, ceftazidime, and clindamycin, as well as ampicillin. Currently, the patient has been treated with Unasyn, to which both organisms were sensitive."  (See Southeast App. Pgs. 4 and 4A)

Unasyn is an antibiotic containing two active ingredients; ampicillin and sulbactam. (See Unasyn App. Pgs. 1-19) The presence of sulbactam in the Unasyn formulation effectively extends the antibiotic spectrum of ampicillin to include many bacteria normally resistant to it and to other beta-lactam antibiotics. Thus, Unasyn is effective for Staphylococcus Aureus and Providencia Stuartii. The Levaquin, added to January 31, 2002, is effective on Provencia Stuartii. (See Southeast Spp. Pg. 2). For these two products to be effective though, they must be administered as they were prescribed; importantly, not missing doses, maintaing therapy for the prescribed length of time.

Most notably, The District of Columbia Lorton Medical Facility and the District of Columbia Department of Correction's contract Facility, Correction Corporation of America (CCA), both failed to provide the proper administration of the prescribed antibiotics.

March 1, 2002, Mr. Davis, transferred to Southeast for removal of "bone of the calcaneus and some necrotic material." Speciman was collected, showing "no organisms seen." Thus, the Unasyn had not been effective, due to its randomly missed administration; but, the addition of Levaquin to the regimen was necessary for positive results. Mr. Davis' suffering, with extreme pain, had been lengthened because his care givers had caused many missed administrations of Unasyn.

March 2, 2002, Dr. McCreary did a port-a-cath procedure, ordered Vancomycin antibiotic IV, and proceeded with extensive debridement, involving removing segments of cancellous bone of the calcaneus. (See Southeast App. Pg. 9). Discharge was on March 9, 2002.

March 9, 2002, Mr. DAvis was taken to DC Jail by DC Jail Staff, where he was intake holding from 12noon til 3:35pm, with no pain meds.

11

At 4pm, Mr. Davis was strip searched by Officer Lawrence and
Officer Ross (T). These two Officers forced Mr. Davis to stand without
his crutches, standing on his pain ridden left foot, while they cursed
at him, telling him "get your ass open or we'll leave you down here
for the next shift."(See Southeast App. 10 'order to only toe touch' 3-8-02

After this painful experience, Mr. Davis was ordered to go to
the third floor infirmary, in his weakened condition and without
the use of a wheelchair. While at the Infirmary, the Infirmary Officer
made the necessary calls to CCA, which accepted Mr. Davis. Thereby,
Mr. Davis was then transported to CCA for admission. Then, at 11pm,
Mr. Davis received his antibiotics, the vancomycin IV and the Keflex
Orally.

After receiving daily bandage changes and antibiotics every
12 hours, from March 10 thru March 11, on March 12, 2002, the antibiotic
vancomycin was discontinued, and Mr. Davis was only given the Keflex.

When Mr. Davis was discharged from the Southeast Hospital on
March 9, 2002, Dr. McCreary issued orders-adding to the Vancomycin IV:
Keflex 500mg daily, Flagyl 500mg daily, and Percocet 2 every 4 hours.
On March 15, 2002, Mr. Davis received his first dose of the antimicrobial
medication, Flagyl. (See Southeast App. Pg. 10 for Discharge Orders)
Therein, CCA was negligent in taking one week to administer the first
dose of Flagyl 500mg to Mr. Davis. This is malpractice with negligence,
as bacteria can grow very rapidly in a fresh surgical wound, especially
one that involves removing a portion of bone. Likewise, on March
15, 2002, Mr. Davis took it upon himself to clean and rebandage his
left foot, due to the blood saturating the sock. A Nurse for CCA
had been by to see Mr. Davis that morning, and even after he showed

12

the Nurse his blood saturated sock, she still chose not to change the bandage, neither did any other Nurse attempt to change the dressing, on this day.

On March 20, 2002, Nurse Taylor informed Mr. Davis that the dressing changes had been discontinued. This was at 8:33pm, where he had not had his bandage changed this day. Then on the morning of March 21, 2002, Mr. Davis was informed that there had been a mistake, and that the dressing changes would be resumed. But, CCA was out of the Kerlix Gauze; so Nurse Johnson used some other material to wrap the foot, not complying with Dr. McCreary's orders.

On the evening of March 24, 2002, Mr. Davis did not receive any medications, antibiotics or pain. Then, on the morning of March 25, 2002, Mr. Davis was informed the prescriptions for his medications had expired, and that the issue would be resolved on March 26, 2002, when Mr. Davis was scheduled for Clinic. Then, the afternoon of March 25, 2002, Nurse Johnson and Nurse Springer informed Mr. Davis that the dressing and packing of his foot with MeSalt had also been discontinued. Dr. Wright, contract Physician for CCA, was present when Nurse Johnson and Springer told Mr. Davis this. But, at 7pm, March 25, 2002, Mr. Davis did receive two Percocet for pain.

On March 26, 2002, Mr. Davis was transported to Southeast Hospital for Clinic. Mr. Davis met with Dr. McCreary, and explained he was receiving a different antibiotic regimen than ordered. Dr. McCreary stated, "This is not good, my last diagnosis and prescriptions were for long term. The Antibiotic IV Vancomycin had not changed, neither the orders for Flagyl 500mg daily, and Keflex 500mg daily."

13

Dr. McCreary then took three (3) pictures of the left heel, and scheduled Mr. Davis for a outside visit for the fitting of a pair of medical shoes. After Clinic, Mr. Davis was taken back to CCA.(App. Pics)

On March 27, 2002, CCA did not administer any antibiotics to Mr. Davis. IN FACT, no antibiotics were administered on the additional days of March 28, March 29, March 30, March 31, April 1, April 2, April 3, 4, 5, 6, 7, and 8. Then, on April 8, 2002, Dr. Wright of CCA, told Mr. Davis that Mr. Davis was right. He was to be receiving the antibiotic regimen that Dr. McCreary of Southeast Hospital had ordered; which included IV Vancomycin, Flagyl, and Keflex.(See CCA App. 1)

During this period of time, where Mr. Davis was not receiving the proper care of his foot (bandage changes and MeSalt packing) and not receiving the antibiotics, the pain became very intense. The pain and suffering was so severe that Dr. Wright ordered Percocet, two tablets every 8 hours. But, even this order was not always fulfilled.

On April 4, 2002, Dr. Wright looked at Mr. Davis' left heel, for the first time since December of 2001. This neglect constitutes gross malpractice. A substandard care, and on some days, no care at all, is being provided by CCA.

Mr. Davis spoke often to Dr. Wright, Nurse Springer, Nurse Lillie, Nurse Green, Nurse Johnson, about his need for pain medication and the antibiotics. On April 3, 2002, at 2:45pm, Nurse Springer paged Dr. Wright. On this date, Dr. Wright phoned and ordered the afore-mentioned Percocet order.

On April 9, 2002, Mr. Davis was returned to Southeast Hospital where Dr. McCreary took additional pictures of the left heel, and

14

ordered the continuation of the antibiotic regimen with the continued administration of pain medication.  (See Appendix of Pictures)

On April 12, 2002, Mr. Davis had a meeting with his Attorney, where Mr. Davis  informed him of the negligent care he was receiving at CCA.  Then, after the Atorney spoke to a member of the CCA Staff, Mr. Davis was placed on Vancomycin IV, every 12 hours, as Dr. McCreary had ordered.  At 2:35pm, Dr. Wright informed Mr. Davis that the result of his most recent culture of the left heel, showed positive for Staphyllococcus Cilli.

On April 15, 2002, Nurse  Springer changed the opsite dressing on the port-a-cath.  This change is suppose to be every 3 days, but in this instance the change had last been done on April 10, 2002. Also, on April 15, Dr. Wright received another culture positive. She informed Mr. Davis that his antibiotic regimen would now be changed. But, April 16, 2002, Mr. Davis received another dose of vancomycin, then received his first dose of Augmentin III 500/125mg.

On April 19, 2002, Mr. Davis was transported to Southeast Hospital from CCA.  After seeing Dr. McCreary, Mr. Davis received discharge orders for Tylenol for pain, to keep the wound area dry for 48 hours, and to only walk with cane  or walker.  (See Southeast App. Pg. 11) During this visit, the port-a-cath was discovered to have failed. (See Southeast App. Pg. 12)(Refer to lack of care 4-10-02 to 4-15-02)

April 22, 2002, Mr. Davis was transported from CCA to Southeast for the removal of the port-a-cath.  (See Southeast App. Pgs 13-14)

On April 25, 2002, Mr. Davis received a fitting for ortho/pros-thesis shoe and insoles, at Southeast Hospital.  Dr. Wright would inform

Mr. Davis when the shoes were ready, which was to be in 2 to 3 weeks. (Dr. McCreary had first informed Mr. Davis of his need for the ortho- pedic shoes, during the morning Southeast Clinic of March 26, 2002.)

On April 26 and 27, 2002, during the evening shift of the 26th and the morning shift of the 27th, at CCA, Mr. Davis did not receive a re-bandaging of the foot nor a packing of the wound with MeSalt. So Mr. Davis complained to Nurse Springer, on April 27, 2002, that the foot needed to be cared for. Then, April 29, 2002, Nurse Johnson would not pack the left heel with MeSalt. But, after Dr. Watusu viewed the blood saturated sock of Mr. Davis, the Dr. made sure that Nurse Johnson change the bandage. Later, Nurse Ross packed the wound with MeSalt.

During the month of May 2002, Mr. Davis received sporadic dressing changes with MeSalt packing of the left heel. On May 2, 2002, Dr. Nuwasu wrote a console for debridement to be performed at Southeast Hospital. On May 3, 2002, Mr. Davis was started on a regimen of oral Augmentin (antibiotic). May 14, 2002, the Augmentin order expired, thus Dr. Nuwasu scheduled a culture of the left heel wound. Then, the evening of May 14, 2002, the Augmentin was administered.

On May 17, 2002, Dr. Nuwasu received the results of another culture. This culture revealed the presence of Staphylococcus Aureus. Dr. Nusasu stated more antibiotics would be ordered. The next day, May 18, 2002, Mr. Davis was placed on "Contact Isolation", due to the Staphylcoccus Aureaus Infection.

Mr. Davis was in "Isolation" CTF-Level 82 of CCA from May 18,

16

2002 thru May 28, 2002, when he was transferred to Southeast Hospital
to meet with Dr. McCreary.   During the period of isolation, on May
24, 2002, Mr. Davis was informed by Ms. "B", Secretary at CCA, that
the CCA Warden would not be authorizing payment for the orthopedic
shoes that Dr. McCreary had ordered on Mary 26, 2002, and Mr. Davis
had been fit for on April 25, 2002 at Southeast Hospital.   Then,
on May 24, 2002, CCA <u>mistakenly</u> transferred Mr. Davis to Southeast
Hospital; but the Hospital would not admit Mr. Davis because his
appointment was not until May 28, 2002.   Upon being returned to CCA,
Mr. Davis spoke with Dr. Nusasu at 4:30pm, informing him that Ms. "B",
Secretary/Mediator Consultation/Request/Completor, had given him
the negative word about CCA Warden Fred Feguoar not authorizing the
payment of the Special Medical Shoes.

At the May 28, 2002, Southeast Hospital visit with Dr. McCreary,
Mr. Davis informed Dr. McCreary that he was not going to be receiving
the shoes because Warden Feguoar would not authorize payment.   Dr.
McCreary said, "The shoes are made, they just need to be paid for."

On May 31, 2002, Mr. Davis filed a grievance with CCA regarding
the Warden, Fred Feguoar, not authorizing the "shoes".   The Grievance
No. was 0705640, then again filed a Grievance, No. 0705758.   Mr.
Davis also spoke to Dr. Nuwasu and Dr. Wright about not receiving
the shoes.   Then, Mr. Davis, mailed copies of the grievances and
concerns about the medical neglect and sporadic medical care, to
his Attorney, Mr. Shapiro.   Mr. Davis also copied this information
to Dr. McCreary, primary care physician, at Southeast Hospital.
(See Appendix Pgs. 1-2, Letter to Dr. McCreary)

On June 1, 2002, Nurse Hinton, CCA, informed Mr. DAvis that the left heel dressing changes and MeSalt packing orders had been changed from twice daily to once daily. This change is in opposition to the May 28, 2002 order of Dr. McCreary. The morning CCA nursing staff was using hydrogen peroxide to clean the wound, and were not then irrigating the wound with sodium chloride solution. Also, on June 1, 2002, Nurse Hinton and Nurse Franswa, administered Mr. Davis' last two antibiotic doses.

On June 3, 2002, Mr. Davis spoke to Dr. Nuwasu about the change of order for the dressing change to once daily, and Mr. Davis' concern that he had not had the wound packed with MeSalt for two weeks. In response, Dr. Nuwasu stated the dressing changes were still to be twice daily with MeSalt packing. Then on June 4, 2002, Dr. Nuwasu told Mr. Davis that the MeSalt was not in inventory at CCA, and was on order. Dr. Nuwasu looked at the wound, finding the circumference was now the size of a nickle and 1" deep. This size increase of the wound was to neglect by the CCA medical staff.

On June 6, 2002, Mr. Davis received his first MeSalt packing in over two weeks of not having this procedure performed. Dr. Nuwasu saw Mr. Davis, informing Mr. Davis that a debridement needed to be done; then the Dr. requested Mr. Davis to remind him on June 10, 2002, to have a debridement scheduled.

On June 10, 2002, Mr. Davis was transferred to Southeast, where he saw Dr. McCreary. The Dr. was concerned about Mr. Davis not receiving the shoes, so the Dr. said he would contact Ms. "B" at CCA, and Dr. Wright at CCA.

On June 13, 2002, CCA Nurse Sharp failed to pack wound with MeSalt.

18

On June 14, 2002, Nurse Sharp failed to change dressing and failed to pack with MeSalt, saying she forgot MeSalt.

On June 15, 2002, Mr. Davis spoke to Dr. Nuwasu about not receiving Indomethacin for pain, because the presctiption had expired.

On June 17, 2002, Nurse Green administered two tylenol tablets for pain, due to the indomethacin prescription not being filled. Nurse Springer stopped to see Mr. Davis, telling him she was quitting CCA.

On June 19, 2002, Dr. Nuwasu told Mr. Davis that he would be given the Cipro antibiotic until June 29th, due to a positive culture. Dr. Nuwasu also ordered the heel to be soaked 15 minutes prior to the MeSalt packing and wrapping with Kling, twice daily. Mr. Davis also spoke to the Warden about the payment of the Orthopedic Shoes, while the Warden toured Medical 82 Ward with the New Chief of Security. Mr. Davis was administered indomethacin for pain, since the prescription had finally been renewed.

On June 24, 2002, The MeSalt packing resumed, though Dr. Nuwasu had ordered for its resumption on June 19, 2002. (CCA had been out of stock with MeSalt.)

On June 25, 2002, Culture results showed the presence of Pseudomones Areuginosa (sp) and Klebsiella Oxytoxia (sp). Mr. Davis was being given Cipro .

On July 11, 2002, Mr. Davis was transferred to Southeast Hospital to receive his Orthopedic Medical Shoes. CCA had finally given authorization for their payment, withholding authorization since Mr. Davis was fit for the shoes on April 25, 2002.

19

During the months August 2002 thru January 2003, the medical negligence and malpractice continued, while Mr. Davis was under the care of CCA Warden, Fred Figeuora , a contract facility for the Department of Corrections of the District of Columbia. Mr. Davis received the same constant sporadic care, suffering undue pain and harm, while CCA continued to randomly have the needed medications and medical supplies in inventory, those items that had been ordered by Physician Dr. Maurice McCreary, of Greater Southeast Community Hospital, District of Columbia, and by Dr. Nuwasu, a contract Physician at CCA "Correctional Corporation of America."

November 2002, Mr. Davis received his last debridement of the left heel. Then by mid December, 2002, Mr. Davis was taken off of all antibiotics and bandage changes and MeSalt packing were discontinued.

February 2003, Mr. Davis was transferred to the Medical Center for Federal Prisoners in Springfield, Missouri. February 6, 2003, he presented with "...a healing plantar calcaneal ulcer that is now covered with hyperkeratotic tissue and a depressed center. There is no surrounding erythema and it appears to be neurovascularly intact." (See Springfield App. Pg. 1) With an impression "...of left calcaneal ulceration that is healed at this time. He has a history of calcaneal osteomyelitis and it appears to be resolving." (See Springfield App. Pg. 2) February 12, 2003, Springfield conducted a Radionuclide Three-Phase Bone Scan, finding an impression of:

> "Abnormal study demonstrating findings consistent with osteo-
> myelitis involving the left cuboid bone. Soft tissue inflammation/
> cellulitis is apparent at the left heel with a mild reactive
> periostitis. There is no evidence to suggest osteomyelitis
> of the calcaneus.'
(See Springfield App. Pg. 3)

During March 2003, Mr. Davis' left heel was cultured, receiving positive for Pseudomonas and Klebsiella bacterial growth. Mr. Davis then was scheduled for a pic-line procedure, which was completed April 8, 2003. Immediately thereafter, Mr. Davis was started on a antibiotic regimen  of Cefepine 2 grams IV every  12 hours and Levaquin 500mg daily. This regimen was ordered for six weeks. (See Springfield App. Pgs. 4-5)

Springfield consistantly administered the antibiotic regimen on a regularly prescribed basis, along with regularly flushing the pic-line with heparin; thus, maintaining its integrity.  (See Springfield App. Pg. 6)

Within four weeks Springfield did a "Three Phase Bone Scan" resulting in an the following impression:

"Today's examination demonstrates a marked reduction in the inflammatory process involving the left cuboid bone."

(See Springfield App. Pg. 10)  Thereby, the proper administration of the antibiotic regimen, given as prescribed without missing doses, resulted in a marked improvement with four weeks. Mr. Davis was experiencing less pain and discomfort due to the "reduction in the inflammatory process"; as a result of the proper medical care Mr. Davis was receiving at Springfield.

In the first week of June 2003, a Lab Report showed Mr. Davis' Blood Cell count to be in the normal range, showing no elevated neutrophils, lymphocytes, or monocytes. (See Springfield App. Pgs. 11-12)  The Doctor , finding positive antibiotic therapy results, ordered removal of the pic-line. (See Springfield App. Pg. 13)

On June 10, 2003, Mr. Davis was seen by Springfield Physical Therapy, whom "recommend custom AFO shoes, not requiring an extra-depth or width." (See Springfield App. Pg. 14) And, on August 4, 2003, Mr. Davis was seen by Dr. Robert Swords, whom recommended "transfer" finding Mr. Davis "denies pain." (See Southeast App. Pg. 15) September 10, 2003, Mr. Davis departed Springfield Medical, with his "left foot, resolved." (See Springfield App. Pg. 16)

### CONCLUSION

WHEREFORE, due to the negligence of the defendants, by causing Mr. Davis to have antibiotic administrations missed, dressing changes missed, MeSait packings missed, transportation needs missed-causing missed appointments at Southeast Community Hospital, pain medication administrations missed, and the cruel and unusual punishment of the District of Columbia Department of Correction's Officers, Mr. Davis request relief ordered from this Honorable Court.

Due to the aforementioned neglect, a segment of cancellous bone of the calcaneus was removed, which has caused Mr. Davis to walk with much discomfort and difficulty, constantly walking with a limp. Mr. Davis will suffer with this impairment for the rest of his life, making it very difficult to perform his duties as a Barber, which is his occupation.

### REQUESTED RELIEF

Mr. Davis request relief in the amount of $5 million dollars ($5,000,000.00) total from the aggregate of the defendants.

RESPECTFULLY SUBMITTED this 12 day of JANUARY, 2007.

_Lawrence Davis Jr._

Lawrence Davis, Jr.

22

LORTON MEDICAL

Appendix Pages

Fax:

**LAWRENCE DAVIS**
Male DOB:07/18/1964                    250665                              : 250665

**09/08/2001 - Office Visit: PPD READ**
**Provider: Obioma A. Nwaobilor LPN**
**Location of Care: SE3**

```
RECORD OF PPD READING

PPD READ
TB-PPD: Done (09/05/2001 7:17:04 PM)
PPD RESULT: 0
Provider: 7101
```

```
***************** Changes to the clinical lists *****************

o Added new observation of (TB PPD RSULT (09/08/2001 10:45:40 PM) = 0)
o Added new observation of (PROVIDER # (09/08/2001 10:45:40 PM) = 7101)
```

**Signed by Obioma A. Nwaobilor LPN on 09/08/2001 at 10:46 PM**

---

**09/09/2001 - Office Visit: URGENT CARE NOTE.**
**Provider: Fidelis Doh MD**
**Location of Care: INTAKE MEDICAL**

```
9/8/01. PT PRES FOR DRESSING CHG OF ULCER LOCATED ON PLANTAR ASPECT OF HEEL.
PT DENIES ANY OTHER COMPLAINTS.
VS T 97.5 P 68  BP 139/80 R 20.
GEN _ PT AAOX3.
WOUND IS CLEAN - NO ERYTHEMA OR WARMTH OR SWELLING NOTED.
WOUND WAS CLEANSED WITH NORMAL SALINE AND PEROIXDE. XEROFOAM DRESSING APPLIED
WITH WET TO DRY DRESSING AND DSD COVERING. WITH GAUZE BANDAGE.
PT RET TO HOUSING UNIT.

E. ROBERTSON-STROTHER  PA-C

***************** Changes to the clinical lists *****************
```

**Signed by Fidelis Doh MD on 09/09/2001 at 5:20 AM**

---

LORTON APP.
#5

07 0200

**09/14/2001 - Office Visit: LEFT FOOT X-RAY**
**Provider: KAREN D. HARRISON DPM**
**Location of Care: Infirmary 3FL**

**FILED**

JAN 3 0 2007

Lorton Medical

Fax:

**LAWRENCE DAVIS**
Male DOB:07/18/1964                250665                          : 250665

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* Changes to the clinical lists \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

o Added new Referral order of (Foot (L) LE 1)

Signed by KAREN D. HARRISON  DPM on 09/14/2001 at 11:10 AM

---

**09/14/2001 - Office Visit: PODIATRY**
**Provider: KAREN D. HARRISON  DPM**
**Location of Care: INTAKE MEDICAL**

PATIENT C/O ULCER ON BOTTOM OF LEFT FOOT X 2 YEARS. STATES STARTED OFF AS A
BLISTER ON FOOT AND THEN GOT WORSE. STATES WAS AT ANOTHER PENAL INSTITUTION
WHEN IT STARTED AND ONLY TX INCLUDED IV ANTIBIOTICS. S/P MOTORCYCLE ACCIDENT
WHICH SHATTERED THE LEFT LOWER EXT. PATIENT STATES UNABLE TO MOVE FOOT UP AND
DOWN AND TOES ARE CURLING UP.
PRESENTS WITH: MUSCLE STRENGTH +1/5 LOWER EXTREMITY LEFT SIDE WITH DROP FOOT
NOTED. MUSCLE WASTING LEFT LEG NOTED.
DIGITS WITH HAMMERING 2-5 LEFT FOOT
NO ANKLE DORSIFLEXION OR PLANTARFLEXION NOTED
PATIENT HAS GRADE 1 ULCERATION PLANTAR CALCANEUS LEFT FOOT ABOUT
2.5 INCHES IN DIAMETER
DIMINISHED LIGHT TOUCH, PROPRIOCEPTION LOWER EXTREMITY LEFT
ULCERATION  WITH SEROUS DISCHARGE, GOOD GRANULAR TISSUE AT THE BASE WITH
NECROTIC TISSUE AT RIM OF ULCERATION
XRAY TENTATIVE- NO EVIDENCE OF OSTEOMYELITIS LEFT CALCANEUS
ASSESSMENT: NEUROPATHIC ULCERATION LEFT FOOT PLANTAR WHICH DOES NOT APPEAR TO
BE INFECTED. PATIENT WILL BENEFIT FROM DEBIDEMENT AND WET TO DRY SALINE
DRESSINGS. CAN DO PACKING WITH NUGUAZE BUT NEED PLAIN GAUZE, NOT IODOFORM.
PLAN: DEBRIDEMENT, WET TO DRY SALINE DRESSING APPLIED
MAY NEED TO DO CAST TO PREVENT BREAKDOWN AND HELP HEAL ULCER
R/A 9/19

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* Changes to the clinical lists \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Signed by KAREN D. HARRISON  DPM on 09/14/2001 at 11:45 AM

---

**09/14/2001 - Office Procedure: FOOT LEFT TRC**          LORTON APP.
**Provider: T. Wilkins Davis  MD**                        # 6
**Location of Care: RADIOLOGY**

**LAWRENCE DAVIS**                                                    : 250665
Male  DOB:07/18/1964                        250665


***************** Changes to the clinical lists *****************

o Added new observation of (CXR (09/17/2001 11:22:53 AM) = Other Findings)

**Signed by Bonnie Davis  MD on 09/19/2001 at 2:28 PM**

---

**09/18/2001 - Office Visit: PODIATRY**
**Provider: KAREN D. HARRISON  DPM**
**Location of Care: INTAKE MEDICAL**


PATIENT SEEN F/U ULCERATION OS CALCIS LEFT FOOT. X-RAY CANNOT R/O SCLEROING
OSTEOMYELITIS OS CALCIS LEFT. RADIOLOGIST RECOMMENDED AND PERFORMED MORE VIEWS
OF THE OS CALCIS. WILL WAIT FOR RESULTS
PRESENTS WITH: ULCERATION DRESSED WITH WET TO DRY DRESSING AND HAS SEROUS
DISCHARGE NOTED.
HAS SOME HEALING OCCURRING SINCE DEBRIDED 4 DAYS AGO. NICE GRANULAR BASE
NOTED. PATIENT AMBULATING WITH CANE PWB
ASSESSMENT:PATIENT HAS A CLEAN WOUND WITH SOME HEALING OCCURRING AFTER INITIAL
DEBRIDEMENT. WILL CONT. WITH WET TO DRY SALINE DRESSING AND PWB. WAIT RESULTS
OF NEXT XRAYS.
R/A 9/21/01 TO ASSESS
PLAN: WET TO DRY SALINE DRESSING APPLIED
R/A 9/21/01

***************** Changes to the clinical lists *****************


**Signed by KAREN D. HARRISON  DPM on 09/18/2001 at 11:37 AM**

---

**09/21/2001 - Office Visit: PODIATRY**
**Provider: KAREN D. HARRISON  DPM**
**Location of Care: INTAKE MEDICAL**


PATIENT SEEN FU ULCERATION PLANTAR LEFT FOOT. SEEN AT GREATER SOUTHEAST COMM.
HOSPITAL AT ORTHOPEDIC CLINIC. PHYSICIAN SUGGESTED AMPUTATION OF LOWER LIMB
SINCE HAS CHRONIC OSTEOMYELITIS. PATIENT STATES HAS BEEN GETTING DRESSING
CHANGES AS ORDERED
PRESENTS WITH: ULCER WITH MINIMAL CHANGE SINCE LAST VIST BUT STILL HAS GOOD
GRANULAR BASE WITH MINIMAL NECROTIC TISSUE
SEROUS DISCHARGE NOTED ON BANDAGE
ASSESSMENT: PATIENT SHOWS SOME SIGNS OF ABILITY TO HEAL ULCER BUT I AGREE WITH
SURGEON IN THINKING THAT BECAUSE OF OSTEOMYELITIS THIS ULCER MAY NOT
COMPLETELY HEAL AND AN AMPUTATION -BK- MAY BE IMINENT.
PLAN: WILL DEBRIDE ULCER TODAY AND APPLY WET TO DRY DRESSING AND CHECK
PROGRESS ON TUESDAY 9/25

LORTON. APP.
#9

00134

December 3, 2001
Page 11
Chart Document

**LAWRENCE DAVIS**
Male DOB:07/18/1964                              : 250665                    : 250665

INMATE REQUESTING FOOT CREAM FOR DRY SKIN DRY SKIN NOTED NO OPEN AREAS OR
RASHES NOTED I WILL RX HE REQUESTED GAS PILLS  I WILL RX GELUSEL

Nursing Sick Call

Plan


Foot Powder/Cream (apply BID X 7 days)

Gelusil (2 tabs po TID X 2 days)



'Return to sick call if symptoms get worse, or if you think you are having a
reaction to the medication such as rash, itching, swelling or nausea.'


***************** Changes to the clinical lists *****************

Signed by Barbara Peace on 09/24/2001 at 11:12 AM

_____

**09/25/2001 - Office Visit: PODIATRY**
**Provider: KAREN D. HARRISON  DPM**
**Location of Care: INTAKE MEDICAL**


PATIENT SEEN F/U ULCERATION PLANTAR LEFT FOOT. STATES GETTING DRESSING CHANGES
AS PRESCRIBED.
PRESENTS WITH: ULCERATION HEALING SLOWLY PLANTAR CALCANEUS LEFT FOOT BUT
APPEARS VIABLE WITH GOOD GRANULAR BASE
DRESSING PRESENT WITH SURGICAL SHOE
ASSESSMENT: ULCERATION SLOWLY HEALING. SUGGEST GALLIUM SCAN TO SEE EXTENT OF
OSTEOMYELITIS TO ASSESS HEALING POTENTIAL BASED ON FINDINGS MENTIONED IN LAST
NOTE
PLAN:DEBRIDEMENT
WET TO DRY SALINE DRESSING APPLIED
CONSULT FOR GALLIUM SCAN
R/A 9/28/01

***************** Changes to the clinical lists *****************

Signed by KAREN D. HARRISON  DPM on 09/25/2001 at 11:29 AM

Lorton App.
# 11

00136

Lorton Medical
Fax:

**LAWRENCE DAVIS**
Male DOB:07/18/1964                    250665                                    : 250665

---

**09/27/2001 - Office Visit: MH encounter**
**Provider: Grace Blackwood**
**Location of Care: SW2**

Pt seen due to KITE request. He is fully oriented, alert and stable. He is
also responsive and able to articulate his concerns effectively. Pt states
that he has been incarcerated for 7 years and that he has been here at CDF
since 9/5/01. Pt was advised to speak with C&P officer. However, he replied
that he has not seen one since his arrival. Writer will flag Ms. Farmer to
query the procedure for investigating mandatory release dates. Pt states that
he is also interested in the drug program here at CDF or should he be
released, a community residential drug program. Mr. Bruce Reid (Safety Net)
flagged to inform him of pt's request. Pt denies any history of mental illness
or treatment. Also denies any suicidal ideation at this time. No S/S
indicative of need for any MH intervention at this time. Will f/u with pt as
needed. He can remain in open population.

***************** Changes to the clinical lists *****************

**Signed by Grace Blackwood on 09/28/2001 at 5:27 PM**

---

**09/28/2001 - Office Visit: PODIATRY**
**Provider: KAREN D. HARRISON DPM**
**Location of Care: INTAKE MEDICAL**

PATIENT SEEN F/U ULCER CALCANEUS PLANTAR LEFT FOOT. STATES HAD FEVER AND NIGHT
CHILLS X 2 DAYS AGO AND STILL HAS A KNOT IN HIS GROIN AREA TODAY.
PRESENTS WITH: LIMB WARM TO WARM FROM KNEE TO DIGIITS 1-5 LEFT FOOT. MILD
ERYTHEMA NOTED WITH SEROUS DISCHARGE ON BANDAGE. PALPABLE NODULE AT FEMORAL
AREA IN GROIN LEFT LIMB.
ULCERATION HEALED SLIGHTLY WITH SOME BOGGINESS AT DISTAL EDGE OF ULCER ABOUT 2
1/4 IN IN DIAMETER
ASSESSMENT: CELLULITIS LOWER EXT. LEFT WHICH MAY HAVE OCCURRED FROM FLAIR UP
OF OSTEOMYELITIS AND MAY HAVE ISLAND NOT VISIBLE IN ULCERATION.
PLAN: NO DEBRIDEMENT WILL DO WET TO DRY SALINE DRESSING
RX FOR ROCEPHIN 1 GM IM STAT
R/A 10/2/01

***************** Changes to the clinical lists *****************

o Rx of (ROCEPHIN I GRAM IM STAT);  #NS x
     Entered by: KAREN D. HARRISON DPM
     Authorized by: KAREN D. HARRISON DPM
     Method used: Print then Give to Patient

LoRToN App.
# 12

00137

**Lorton Medical**

, 
Fax:

**LAWRENCE DAVIS**
Male DOB:07/18/1964                    250665                              : 250665

**Location of Care: RADIOLOGY**

```
RADIOLOGY PROCESSING
*
X-ray Type: Intake
X-ray Group: CXR
X-ray Ordered: CHEST PA
Date Requested: 10/01/2001
Exam Status: Complete
Date of Exam: 10/02/2001
Technologist: R. Douglas

RADIOGRAPHIC REPORT
*
Radiologist: Dr. T. Wilkins Davis
Report Date: 10/03/2001
Findings: Negative CXR
Report Category: Normal
Report Status: Complete
```

***************** Changes to the clinical lists ****************

o Added new observation of (CXR (10/02/2001 11:11:08 AM) = Negative CXR)

**Signed by T. Wilkins Davis  MD on 10/03/2001 at 3:30 PM**

---

**10/09/2001 - Office Visit: podiatry**
**Provider: KAREN D. HARRISON  DPM**
**Location of Care: INTAKE MEDICAL**

```
patient seen f/u ulceration left foot plantar calcaneus.
denies night sweats or fever. states gets regular dressing changes.
presents with: slowly healing ulcer left foot grade 0 with mild odor today.
serous discharge noted on bandage. pink granular base  with no necrotic tissue
noted
bullus about size quarter just distal or anterior rim of ulcer probably due to
tinea pedis.
assessment: patient's ulceration healing very slowly. will pack today with
plain nuguaze to ensure no pockets of infection present and reorder gallium
scan to assess extent of osteomyelitis calcaneus left foot
plan: packing with 1/4" plain nuguaze then wet to dry  saline dressing.
consult for gallium scan done
r/a 10/12/01
```

***************** Changes to the clinical lists ****************

LoRTON App.
# 14

Lorton Medical

Fax:

**LAWRENCE DAVIS**
Male DOB:07/18/1964                250665                                    250665

SUBMANDIBULAR AREA AT THE SHAVED AREA.
CHEST CLEAR TO AUSCALTATION
CVS S1&S2 REGULLAR
ABD SOFT NON TENDER NO ORGANOMEGALY
ASSSYCOSIS BRABAE
PLAN DICLOXACILIN 500 MG PO QIDX 7 DAYS

**************** Changes to the clinical lists ****************

o Rx of (DICLOXACILIN 500 MG 1TAB PO Q6HRS X 7 DAYS);  #BS x
     Entered by: Gebremedhin Yohannes MD
     Authorized by: Gebremedhin Yohannes MD
     Method used: Print then Give to Patient
o Added new medication of (DICLOXACILIN 500 MG 1TAB PO Q6HRS X 7 DAYS) -
committed

**Signed by Gebremedhin Yohannes MD on 10/15/2001 at 12:41 PM**

---

**10/16/2001 - Office Visit: PODIATRY**
**Provider: KAREN D. HARRISON DPM**
**Location of Care: INTAKE MEDICAL**

PATIENT SEEN F/U ULCERATION CALCANEUS RIGHT FOOT. STATES BLISTER ON FOOT
OPENED AND HE PULLED THE SKIN FROM AROUND FOOT AND NOW HAS SOME SKIN HANGING
FROM AROUND ULCER.
PRESENTS WITH: DEROOFED BLISTER AT DISTAL EDGE OF ULCERATION       WITH
EXTENSIVE AREA OF SKIN LACERATED FROM SURFACE. NEW SMALL AREA ULCERATED WERE
SKIN WAS LACERATED AT LATERAL EDGE OF PREVIOUS ULCERATION. ULCERATION
CALCANEUS RIGHT FOOT APPEAR DO BE DEVELOPING A SMALL ISLAND CENTRALLY WITH
SEROUS DISCHARGE, STILL GRADE 0 WITH GOOD GRANULAR BASE NOTED.
ASSESSMENT: OSTEOMYELITIS AT CALCANEUS APPEARS TO AFFECTING THE HEALING
POTENTIAL OF THIS ULCER AND PATIENT HAS FURTHER DECREASED ITS HEALING
POTENTIAL BY PULLING ON SKIN AND WEAKENING THE AREA EVEN MORE. STILL SKEPTICAL
OF HEALING POTENTIAL OF THIS ULCER BECAUSE OF TIME PRESENT AND INFECTION
APPARENT.  PATIENT AWARE OF POSSIBLITY OF AMPUTATION
PLAN: NUGUAZE PACKING-PLAIN TO ULCER WITH WET TO DRY SALINE DRESSING APPLIED
RIGHT FOOT ULCERATION
RECONSULT 3RD TIME FOR GALLIUM OR INDIUM SCAN ASAP TO ASSESS EXTENT OF
OSTEOMYELITIS.
R/A 10/19
RX MOTRIN 800

**************** Changes to the clinical lists ****************

o Rx of (MOTRIN 800 #60 ONE PO TID X 20 DAYS);  #BS x
     Entered by: KAREN D. HARRISON  DPM
     Authorized by: KAREN D. HARRISON  DPM
     Method used: Print then Give to Patient
o Added new medication of (MOTRIN 800 #60 ONE PO TID X 20 DAYS) - committed

**Signed by KAREN D. HARRISON  DPM on 10/16/2001 at 10:59 AM**

LorToN App.
# 17

00142

Lqrton Medical

Fax:

**LAWRENCE DAVIS** : 250665
Male DOB:07/18/1964    250665

**************** Changes to the clinical lists *****************

o Rx of (INDOCIN 50MG po tid prn x 2 weeks);  #BS x
     Entered by: Gebremedhin Yohannes MD
     Authorized by: Gebremedhin Yohannes MD
     Method used: Print then Give to Patient
o Changed medication from (INDOCIN 50MG po tid prn x 2 weeks) to (INDOCIN 50MG
po tid prn x 2 weeks) - committed

**Signed by Gebremedhin Yohannes MD on 11/15/2001 at 1:05 PM**

_____

**11/16/2001 - Office Visit: PODIATRY**
**Provider: KAREN D. HARRISON  DPM**
**Location of Care: Infirmary 3FL**

PATIENT RETURNED FROM ANOTHER INSTITUTION. BEING SEEN AGAIN FOR TREATMENT OF
ULCERATION PLANTAR LEFT CALCANEUS. BONE SCAN DONE REVEALS WHAT SUSPECTED WHICH
IS OSTEOMYELITIS OF THE INFERIOR POSTERIOR LEFT CALCENEUS LEFT FOOT.
ULCERATION STILL HAS NOT HEALED. STATES SOME SOAKING OF WOUND WAS DONE WHILE
AT ANOTHER INSTITUTION WHICH STRONGLY DISAGREE WITH.
ASSESSMENT: PATIENT EXPLAINED ONCE AGAIN THAT ULCERATION WILL NOT HEAL AS LONG
AS OSTEOMYELITIS IS PRESENT. BECAUSE OF THE NATURE AND LOCATION OF THE ULCER
THE PATIENT WOULD PROBABLY ONLY BENEFIT FROM AMPUTATION. WILL REFER TO SURGERY
AT GREATER SOUTHEAST FOR ANOTHER OPINION.
PLAN: CONSULT FOR SURGERY AT GSCH
R/A 1WEEK

**************** Changes to the clinical lists *****************

**Signed by KAREN D. HARRISON  DPM on 11/16/2001 at 11:13 AM**

_____

**11/16/2001 - Office Visit: CN RPT SURG**
**Provider: S. Tinubu  MD**
**Location of Care: Receiver, Medical and Mental Health Svcs**

TRANSCRIPTIONIST: S. DORSEY          Lorton App.
                                          # 23
TRANSCRIPTION DATE: 11/16/01

CONSULTANT: S.TINUBU

DATE DICTATED: 9/6/01

GREATER SOUTHEAST COMMUNITY HOSPITAL

Appendix Pages

BEGINNING OF REPORT FOR:
GREATER SOUTHEAST HEALTHCARE SYSTEMS * MED. RECORD NBR: 000887863
GREATER SOUTHEAST COMMUNITY HOSPITAL * G0129900077        10/29/01 1359
DEPARTMENT OF RADIOLOGY              * ZEBRA,LAWRENCE
RADIOLOGIC CONSULTATION REPORT       * 8W-824-A   BD: 07/18/64  M 37Y
                                     * MCCREARY,MAURICE L
                                     * DC DEPT CORRECTIONS/ GSCH PT A
*******************************************************************************

Chk-in #   Order    Exam

631118     0001     73005   NM BONE THREE PHASE              10/26/01 0917


Clinical history: LARGE DEFECT OF THE SOFT TISSUES BENEATH THE LEFT
HEEL.

NUCLEAR MEDICINE THREE PHASE BONE SCAN:
    Following the administration of 26.9 mCi of Tc99m MDP the
flow study shows an increased uptake or concentration in the area
of the left heel.  The three hour delayed filming shows intense
uptake of the posterior left calcaneal bone consistent with
osteomyelitis.

IMPRESSION:
    Osteomyelitis of the inferior posterior left calcaneal bone.


                    /READ BY/ EDWARD B WADDY
                    /Released By/ HEE H LEE
    GLB


COMPLETE DUPLICATE                              Page :1


    MCCREARY,MAURICE L
    1328 SOUTHERN AVE, SE           G. S. E. H.
    #311
    WASHINGTON    DC        20032   App # 1


                                                      00113

```
GREATER SOUTHEAST COMMUNITY HOSPITAL          MR:  (000)000/00887953        ADMITTED: 11DEC01
WASHINGTON, D.C.                              ZEBRA, DAVIS                  ACCT: 00134500170
DEPARTMENT OF PATHOLOGY                        8W   0824 A    18JUL64       MALE    37 YRS
-CHAIRMAN: DAVID REAGIN, M.D.                 DR. MCCREARY, MAURICE
```
*****************************************************************************************

### PATHOLOGY LABORATORY CUMULATIVE REPORT

*****************************************************************************************
*****************************************************************************************

# M I C R O B I O L O G Y

*****************************************************************************************

```
COLLECTED   14DEC01  2321                              RECEIVED    14DEC01  2352
SOURCE      ULCER                                      STARTED     15DEC01  0327
            LEFT
```

STAINS/PREPARATION

GRAM STAIN                          15DEC01 1303
NO ORGANISMS SEEN

-----------PRELIMINARY REPORT-------------
                                    16DEC01 0908
CULTURE IN PROGRESS
                                    17DEC01 1010
LIGHT GROWTH STAPHYLOCOCCUS AUREUS, SUSCEPTIBILITY TO
 FOLLOW
LIGHT GROWTH GRAM NEGATIVE RODS, IDENTIFICATION AND
 SUSCEPTIBILITIES TO FOLLOW.

----------------FINAL REPORT----------------
                                    18DEC01 1022
LIGHT GROWTH STAPHYLOCOCCUS AUREUS
LIGHT GROWTH PROVIDENCIA STUARTII

|                | -------------- SUSCEPTIBILITY TESTING -------------- |         |          |
|----------------|------|---------|----------|
|                |      | P STUART | S AUREUS |
| AMIKACIN       | KBS  | S       |          |
| AMPICILLIN     | KBS  | R       |          |
| CEFAZOLIN      | KBS  | R       | S        |
| CEFTAZIDIME    | KBS  | R       |          |
| CLINDAMYCIN    | KBS  |         | S        |
| ERYTHROMYCIN   | KBS  |         | R        |
| GENTAMICIN     | KBS  | S       |          |
| IMIPENEM       | KBS  | S       |          |
| OXACILLIN      | KBS  |         | S        |
| PENICILLIN     | KBS  |         | S        |
| TETRACYCLINE   | KBS  |         | R        |
| TOBRAMYCIN     | KBS  | S       |          |
| VANCOMYCIN     | KBS  |         | S        |
| CEFOTETAN      | KBS  | S       |          |
| LEVOFLOXACIN   | KBS  | S       |          |
| AMP/SULBACTAM  | KBS  | S       | S        |

PAGE INCLUDES:                      MICROBIOLOGY

ZEBRA, DAVIS
                                                       CHART DATE: 19DEC01
                                                                   CONTINUED ...
```

G.S.E.H.
APP. #2

**Greater Southeast Community Hospital Corporation I**
1310 Southern Avenue, S.E.
Washington, D.C. 20032

# REPORT OF
# HISTORY AND PHYSICAL EXAMINATION

GSCH Form 158  Rev. 4/00

Imprinter

**MEDICAL HISTORY**
**(ORDER OF RECORDING)**

1. CHIEF COMPLAINT
2. PRESENT ILLNESS
3. PAST HISTORY
   CHILDHOOD
   ADULT
   OPERATIONS
   INJURIES
4. FAMILY HISTORY
5. SOCIAL HISTORY
6. SYSTEMIC HISTORY
   GENERAL
   SKIN
   HEAD, EYES, EARS,
     NOSE, THROAT
   NECK
   RESPIRATORY
   CARDIOVASCULAR
   GASTRO-INTESTINAL
   GENITOURINARY
   GYNECOLOGICAL
     & MENSTRUAL
   LOCOMOTOR
   NEURO-PSYCHIATRIC

HEENT → No head trauma, H/A, N/V, visual Δes, tearing, blurriness, acute visual loss, hearing loss, tinnitus, vertigo, earache, rhinorrhea, stuffiness, sneezing, allergy, epistaxis, hoarseness, sore throat

NECK → Reports no swelling neck
Respiration → No SOB, COPD, Sputum, hemoptysis, pneumonia, TB, Last Cx-ray unknown
Cardiovascular → No report of HTN, Angina, murmur, palpitation, dyspnea on exertion, PND, Last EKG
GI → Reports no appetite Δ, N/V, Indigestion, dysphagia, abd pain, jaundice or hepatitis
GU → No report of polyuria, dysuria, hematuria
Locomotor → Reports no muscle weakness, swelling, arthritis, gait, joint stiffness
Neuro-psychiatric → Reports loss of sensation, numbness, tingling, tremor, mood Δes, ankle edema

Physical Exam

General → AA ♂ WDWN in NAD, appears stated age

Skin → NL color consistent c̄ genetic heritage, good turgor & lesion, temp difference or texture abnormality

Lymphatics → ∅ Lymphadenopathy

EENT → PERRLA, EOMI, nasal septum intact, nose & throat clear, ∅ thyromegaly

Mouth → ∅ bleeding gum, lesions or exudate

Neck → Neck supple, ∅ thyroid deviation

Chest → CTA bil ∅ w/r/c

Heart → RRR c̄ nl S1 S2 & S3 S4 r/m/g

Abd → soft 13.5 x 4.9, nontender, no mass active, flat & surface abnormalities, masses, ∅ organomegaly

Genitalia → Rectal & Pt Deferred

Locomotor → Symmetrical muscle mass ⊕ involuntary mvt.

Extremities → FROM in all joints, nl capillary refill, loss of sharp/dull test on L toes, and absence proprioception L toe

**PHYSICAL EXAMINATION**
**(ORDER OF RECORDING)**

1. GENERAL
2. SKIN
3. LYMPHATIC
4. EYES, EARS, NOSE, THROAT
5. MOUTH
6. NECK
7. CHEST
8. HEART BLOOD VESSELS
9. ABDOMEN
10. GENITALIA
    VAGINAL
    RECTAL
11. LOCOMOTOR
12. EXTREMITIES
13. NEUROLOGICAL

**DIAGNOSTIC IMPRESSION**

Diagnostic Impression → Chronic Osteomyelitis L foot

**TREATMENT PLAN**

Tx Plan → Unasyn 1.5 grm IV q6h
Tylenol #3 ① po q4h prn pain
Clean defect ⊕ peel c̄ H2O2 & dress c̄ 4x4 sponge

DATE: 12/11/01  TIME: 7:00PM  SIGNATURE: _____
G.S.E.H APP.



**Greater Southeast Community Hospital**
1310 Southern Avenue, Southeast
Washington, D.C. 20032
(202) 574-6000

**TRANSFER SUMMARY**

PATIENT NAME:           ZEBRA, DAVIS
MEDICAL RECORD NUMBER:  00887863
DATE OF ADMISSION:      12/11/01
DATE OF DISCHARGE:      12/20/01
ATTENDING PHYSICIAN:    MAURICE MCCREARY, M.D.


DISCHARGE DIAGNOSES:
1.   Osteomyelitis, left heel.
2.   Atrophy of left lower extremity secondary to nerve injury.

PROCEDURE:  Debridement of left heel draining osteomyelitis with
culture results of Staphylococcus aureus resistant to ampicillin and
placement of a Port-A-Cath in the left internal jugular vein.

HISTORY OF PRESENT ILLNESS:  The patient is a 37-year-old black male
who presents with an open wound of the left heel.  The patient has had
an ulcerated lesion of the left foot for approximately two years.  The
lesion started as a small defect and gradually gained some fluid and
then ruptured.  The patient was performing self-care of this.  The
patient had a fracture of the left femur that was repaired by
insertion of a rod in June of 1986.  The injury to the left foot was
in 1999.  The patient's HIV status is negative.

The past medical history and review of systems is otherwise
noncontributory.

ADMISSION PHYSICAL EXAMINATION:
GENERAL APPEARANCE:  The patient was a well-developed, well-nourished
black male in no acute distress.  He was alert and cooperative and
oriented.
EXTREMITY EXAM:  Physical findings were limited to examination of the
left lower extremity.  The left leg was noticeably atrophied.  Atrophy
of the muscles around the foot was noted, as well.  There was some
slight sensation above the ankle.  However, the foot itself was
insensate.  There was a large, 4-cm, circular heel ulcer with some
drainage coming from the central portion of the area.

IMPRESSION:  Osteomyelitis of the left calcaneus.

PLAN:  Intravenous antibiotics, debridement of the wound, and
placement of a catheter for long-term antibiotic use.

HOSPITAL COURSE:  The patient had a three-phase bone scan done prior
to his admission, and this bone scan demonstrated evidence of
osteomyelitis.  The patient was taken to the operating room on
December 15 for debridement of the ulcer.  Cultures were taken at the
time and revealed Staphylococcus aureus, which was resistant to

G.S.E. H.
AWP # 4A

00199

PATIENT NAME:                    ZEBRA, DAVIS
MEDICAL RECORD NUMBER:    00887863

**PAGE 2**

erythromycin and tetracycline.  A second organism grew as Providencia stuartii, which was resistant to cefazolin, ceftazidime, and clindamycin, as well as ampicillin.  Currently, the patient has been treated with Unasyn, to which both organisms were sensitive.

The patient has received the maximum benefits of this hospitalization. His Port-A-Cath is in place.  The Port-A-Cath is accessed with a right-angle Huber called a gripper needle, and the pigtail can be exposed for the administration of IV antibiotics.  The patient should avoid weightbearing to the left lower extremity.  This is probably best achieved by allowing the patient to toe touch but to not plant the heel or do complete weightbearing.  The patient is to continue having dressing changes done at least daily by cleaning the area with a skin cleanser, such as Carra-Klenz, followed by packing snugly with a 1/2-inch Mesalt dressing.  In the meantime, he can receive his Unasyn 3 g IV q.8h.

In the event that the Huber needle becomes dislodged, the patient will need to have a similar device placed.  The patient should not have a normal needle placed in the area for fear of coring out the Port-A-Cath and causing it to fail.  After each use, the patient should have flushing with 10 cc of normal saline, followed by 5 cc of heparin flush.

CONDITION ON DISCHARGE:  Very satisfactory.  Every attempt should be made to close the heel wound.  Any questions can be directed to me at (202) 574-6994 or (202) 561-1544.

FOLLOWUP:  The patient should return for a needle change approximately weekly, although he can go as long as two weeks as long as there is no purulence noted on or around the dressing.  The patient has an Op-Site dressing, which is waterproof and intact at this point and can remain in place for 10 days or more without difficulty.

MM/ddi/rn
D:12/19/01
T:12/19/01
BY:0566
1R/0RRLA/J:0892
XZ:#1160892.DJ1

MAURICE MCCREARY, M.D.

G.S.E.H.
APP. # 4 B

**Greater Southeast Community Hospital**
**Washington, D.C.**

# PATIENT DISCHARGE INSTRUCTIONS

IMPRINTER

| Diagnosis/Problem: | ☑ Return to _Clinic_ |
|---|---|
| _Osteomyelitis ① Calcaneus_ | on _____ |
| | ☑ Call _202-574-7222_ for an |
| Discharge Date: _12/20/01_ | appointment (phone _____ ) |

| Medications: | Dosage: | To Be Taken: |
|---|---|---|
| _Tylenol #3_ | | _Take 1 Tb. q4h per pain_ |
| _ZN sulfate_ | _220mg_ | _P.o. qd_ |
| _Vit C_ | _500mg_ | _P.o. Bid_ |
| _Vit A_ | _10,000_ | _P.o. qd_ |
| _Unasyn_ | _3.0gm_ | _IV q8h via Port-a-cath_ |
| _Line in place. Flush c 10cc NS and 5cc Hepain Flush p use_ | | |

Diet: _Regular diet_
If you have questions about your special diet, call the dietitian at (202) 574-6694.

Special Instructions/Comments:
_Dressing change daily, Clean Left heel ulcer_
_c skin cleanser (cavilon) and pack snuggly c_
_1/2 insol-t Wrap c kling. No Weight bedding_
_left foot. Pt to use crutches._

**Activities Allowed:**

Limitations
- ❑ None
- ❑ No lifting of heavy objects or exercise until _____
- ❑ No sexual activities until _____
- ☑ Do not drive until _____

Walking
- ❑ No limitations
- ❑ Walk as comfort permits
- ☑ Use a walker or cane _Crutches_
- ❑ Do not climb stairs until _____
- ❑ Do not walk until _____
- ❑ If unable to walk, see above instructions

Bathing
- ❑ Sponge bath only until _____
- ☑ Keep wound area dry until _____
- ☑ May shower
- ❑ May take tub bath

Other limitations: _____

**CALL YOUR DOCTOR SHOULD YOU HAVE ANY MEDICAL PROBLEM THAT WORRIES YOU OR ANY MEDICAL QUESTIONS THAT YOU WISH ANSWERED.**

Social Service/Home Health Agency _G.S.E.H._

Agency _____ Person to call _____ Phone _APP. #5_

Signature: Patient/Responsible Party
I have received and understand the above instructions

X _Lawrence Davis_ _12/20/01_

Signature: Health Care Personnel
The patient/family has received the above instructions and demonstrated understanding

_____ Signature/Health Care Personnel

GSCH Form 260  Rev 2/93    WHITE-Medical Records    YELLOW-Patient or Responsible Party    PINK-Physician



**Greater Southeast Community Hospital**
1310 Southern Avenue, Southeast
Washington, D.C. 20032
(202) 574-6000

## TRANSFER SUMMARY

PATIENT NAME:          DAVIS, LAWRENCE
MEDICAL RECORD NUMBER:  00887863
DATE OF ADMISSION:      01/04/02
DATE OF DISCHARGE:
ATTENDING PHYSICIAN:    MAURICE MCCREARY, M.D.

ADMISSION DIAGNOSIS:
Bleeding around Port-A-Cath needle.

FINAL DIAGNOSIS:
Functioning Port-A-Cath.

PROCEDURE:    Replacement of Port-A-Cath needle and resumption of intravenous Unasyn antibiotic.

INDICATIONS:   The patient is a 37 year-old, black male with chronic osteomyelitis of the left heel. The patient has an insensate foot on the left. The patient has had a fracture of the left femur in the mid to early 1990s. He has a rod in place. There appears to be some damage to the sciatic nerve. The patient also has chronic atrophy of the left leg. The past medical history and review of systems are otherwise noncontributory.

PHYSICAL EXAMINATION:  The patient was a well-developed, well-nourished, black male in no acute distress. He was alert, cooperative, and oriented. His pertinent findings were limited to examination of the left lower extremity, where the left lower extremity was smaller than the right. There was circular ulcer on the heel of the left foot, which measured approximately 3 cm in its largest diameter. The wound dressing change involved cleaning with Carra Cleanse and then placing gauze in the area where the wound is healing.

HOSPITAL COURSE:  The patient was admitted for intravenous antibiotics. The needle was replaced. His intravenous antibiotics included Unasyn 3 gm on a long term basis. At this time, the patient also demonstrated some hypertension. The patient stated that he was started on an antihypertensive, but cannot remember the name of the medication. We started the patient on Procardia-XL 30 mg p.o. daily. In the meantime, the patient can receive Procardia 10 mg sublingually for systolic blood pressure of greater than 160.

G.S.E. H.
APP # 6

GREATER SOUTHEAST COMMUNITY HOSPITAL
WASHINGTON, DC 20032                          PAGE 4
DEPARTMENT OF PATHOLOGY
CHAIRMAN: DAVID REAGIN, M.D.
*********************************************************************

# PATHOLOGY LABORATORY CUMULATIVE REPORT

*********************************************************************

LOCATION
8 WEST

---

| | |
|---|---|
| PATIENT: ZEBRA, LAWRENCE | ACCT #: V00000049828  LOC:  8W          U #: M00887863 |
| | AGE/SX: 37/M            ROOM: 825         REG: 03/01/02 |
| REG DR:  MCCREARY, MAURICE L | STATUS: ADM IN          BED:  B           DIS: |

*********************************************************************
MICROBIOLOGY CONTINUED
*********************************************************************

Collection Date: 03/01/02

---

**GRAM STAIN**  *Final 03/01/02*

NO ORGANISMS SEEN

**GRAM STAIN**  *Final 03/01/02*

NO ORGANISMS SEEN

---

Cancelled Specimens

01:C00156S      CAN, Coll: 03/01/02-0920 Recd: - (R#00052639) MCCREARY, MAURICE L
    Ordered: CHEM7
    Comment: DUPLICVATE
0301:H00111S      CAN, Coll: 03/01/02-1000 Recd: 03/01/02-1036 (R#00052639) MCCREARY, MAURICE L
    Ordered: CBCWODIFF
    Comment: DUPLICATE ORDER

---

| Patient: ZEBRA, LAWRENCE | Age/Sex: 37/M | Acct#V00000049828 Unit#M00887863 |
|---|---|---|

** END OF REPORT **                    CHART DATE: 03/04/02

G.S.E.H.
ADD # 7

00187



**Greater Southeast Community Hospital**
1310 Southern Avenue, Southeast
Washington, D.C 20032
(202) 574-6000

## OPERATIVE REPORT

PATIENT NAME:            ZEBRA, LAWRENCE
MEDICAL RECORD NUMBER:   00887863
DATE OF ADMISSION:
DATE OF OPERATION:
SURGEON:                 MAURICE MCCREARY, M.D.
ROOM NUMBER:

FIRST ASSISTANT:         Amel, MS-III.

PREOPERATIVE DIAGNOSIS:
Osteomyelitis, left heel with an open nonhealing wound.

POSTOPERATIVE DIAGNOSIS:
Osteomyelitis, left heel with an open nonhealing wound.

ANESTHESIA:
Spinal.

ANESTHESIOLOGIST:        Scott Burr, M.D.

INDICATIONS:  The patient is a 37-year-old with a chronically
nonhealing ulcer of the left heel.  The patient has had two to three
phase bone scans which indicate osteomyelitis of the left heel.  The
patient has had one course of long-term antibiotics without any
remarkable results.  He is now admitted for extensive debridement.

PROCEDURE:  After the administration of satisfactory spinal
anesthetic, the patient's left lower extremity was prepped and draped
in a sterile manner.  The incision was made around the nonhealing
ulcer in a circular fashion.  The incision was carried down to the
bone surface.  Then, using rongeurs and curets, the bone of the
calcaneus was removed along with the articular surfaces that were
noticed on removal as some of the necrotic material.  The wound was
then packed with Mesalt after obtaining hemostasis.  The wound was
packed with Mesalt ribbon.  Sterile dressing was applied beyond that.
The patient was taken to the recovery room in satisfactory condition.

MM/ddi/b3
D:03/05/02
T:03/06/02
BY:0566                      MAURICE MCCREARY, M.D.
1O/0V7HT/J:7242
XZ:#1147242.352

G.S.E.H.
APP. # 8

00181



**Greater Southeast Community Hospital**
1310 Southern Avenue, Southeast
Washington, D.C. 20032
(202) 574-6000

## TRANSFER SUMMARY

PATIENT NAME:              ZEBRA, LAWRENCE
MEDICAL RECORD NUMBER:     00887863
DATE OF ADMISSION:         03/01/02
DATE OF DISCHARGE:         03/09/02
ATTENDING PHYSICIAN:       MAURICE MCCREARY, M.D.


DISCHARGE DIAGNOSES:
1.  Osteomyelitis, left heel.
2.  Sciatic nerve damage to the left lower extremity with an
    insensate foot and leg and with obvious muscular atrophy.

HISTORY OF PRESENT ILLNESS:  This patient is a 37-year-old black male
who presented with a chronic, nonhealing ulcer of the left heel.  The
patient had been previously admitted and underwent a soft-tissue
debridement with what was believed to be adequate drainage.  The
patient had a Port-A-Cath in place, for which he received IV
antibiotics.  A repeat bone scan was done and showed essentially no
change in the appearance of the osteomyelitis.  The patient was
readmitted for more extensive debridement of soft tissue and bone.

PAST MEDICAL HISTORY:  The patient has hypertension, for which he is
treated with Calan.  He had a rod placed in the left femur.  This was
secondary to a fracture.  The mechanism of the injury is unknown;
however, it is known that the patient has atrophy of the left lower
extremity and a severe neurologic defect.

PHYSICAL EXAMINATION:
GENERAL APPEARANCE:  The patient is a well-developed, well-nourished
black male in no acute distress.  He is alert, cooperative, and
oriented.
EXTREMITIES:  Pertinent physical findings were limited to examination
of the left foot.  The left foot is atrophied when compared to the
right.  The patient is unable to dorsiflex or plantar flex the left
foot.  The bottom of the foot and perhaps the ankle are both
insensate.  There is a 3-cm circular defect at the calcaneus.

IMPRESSION:  Osteomyelitis, by history and by bone scan.

PLAN:  The plan is to admit the patient for IV antibiotics through his
Port-A-Cath using IV vancomycin and to proceed with an extensive
debridement, which will involve removing segments of cancellous bone
of the calcaneus.

HOSPITAL COURSE:  The patient underwent debridement of the left
calcaneus on 03/02/02.  He was admitted for IV antibiotics, which was
accomplished.  The dressing changes were done thereafter twice a day.
The wound was clean at this point and healing.

G.S.E. H.
App. # 9

00178

PATIENT NAME:          ZEBRA, LAWRENCE
MEDICAL RECORD NUMBER:   00887863

'PAGE 2


The patient was seen by a physiatrist, who will prescribe orthotics
for his foot at some time in the future after more healing is seen.
In the meantime, advice was given for him to use crutches and a cane
and that he do no weightbearing on the foot.

The patient appears to understand the advice and the fact that he will
need to have dressing changes done twice daily.  He has used crutches
in the past and understands that he can toe touch but is not to bear
weight on the left foot.

He is discharged, having received maximal benefits of this
hospitalization.

DISCHARGE MEDICATIONS:
1.   Keflex 500 mg p.o. q.d.
2.   Flagyl 500 mg p.o. q.d.
3.   Percocet 2 tablets p.o. q.4h. p.r.n. pain.

If it is not possible to provide the patient with Percocet, then one
can substitute Tylenol No. 3 or Tylenol No. 4 p.o. q.4h. p.r.n. pain.

FOLLOWUP:  The patient was advised to return to the clinic here at
Greater Southeast Community Hospital in two weeks for a wound check.


MM/ddi/rn
D:03/08/02
T:03/08/02                    _____
BY:0566                       MAURICE MCCREARY, M.D.
1R/0VBCA/J:7673
XZ:#1167673.382




G.S.E.H
APP. #10

00179

GREATER SOUTHEAST COMMUNITY HOSPITAL
WASHINGTON, D.C. 20032
DEPARTMENT OF PATHOLOGY
CHAIRMAN: DAVID E. REAGIN, M.D.
ATTENDING PHYSICIAN: MCCREARY, MAURICE L
SURGEON: MCCREARY, MAURICE L

NAME: DAVIS, LAWRENCE
MR: M00887863
ACCT: V00000084951
SEX/AGE: M/37
LOCATION: IOG
SPECIMEN RECEIVED: 04/19/02     ADMIT DATE: 04/19/02

## SURGICAL PATHOLOGY

ACCESSION: S-02-001563     SURGERY DATE: 04/19/02

## SPECIMEN:

Port-a-cath.

## PRE-OP DIAGNOSIS:

Failed port-a-cath.

## POST-OP DIAGNOSIS:

Same as pre-op.

## CLINICAL HISTORY:

Failed port-a-cath.

## GROSS DESCRIPTION:

The specimen is received in formalin and labeled port-a-cath.
The specimen consists of a port-a-cath which measures 40 cm in
length.  There are black markings at 5 cm intervals stopping
10 cm from the tip.  Gross only.

## DIAGNOSIS:

Device, removal:  Grossly identified as a port-a-cath.

Timothy Burton MD
*04/22/02 - 1419*

** CONTINUED ON NEXT PAGE **

G.S.E.H.
APP. # 11

00175

GREATER SOUTHEAST COMMUNITY HOSPITAL
WASHINGTON, D.C. 20032
DEPARTMENT OF PATHOLOGY
CHAIRMAN: DAVID E. REAGIN, M.D.
ATTENDING PHYSICIAN: MCCREARY,MAURICE L
SURGEON: MCCREARY,MAURICE L

NAME: DAVIS,LAWRENCE
MR: M00887863
ACCT: V00000084951
SEX/AGE: M/37
LOCATION: IOG

SPECIMEN RECEIVED: 04/19/02    ADMIT DATE: 04/19/02

## SURGICAL PATHOLOGY

ACCESSION: S-02-001563    SURGERY DATE: 04/19/02

**MEDICAL CODES**

CODES: TD3050 - Chest wall, NOS
       TD3050|A00100 - Chest wall, NOS|Device, NOS
       TD3050|P103000 - Chest wall, NOS|Excision, NOS

                    Timothy Burton MD 04/22/02

                    SIGNATURE ON FILE

** END OF REPORT **

G.S.E. H
APP # 12

00176



**Greater Southeast Community Hospital**
1310 Southern Avenue, Southeast
Washington, D.C. 20032
(202) 574-6000

## OPERATIVE REPORT

PATIENT NAME:             DAVIS, LAWRENCE
MEDICAL RECORD NUMBER:    00887863
DATE OF ADMISSION:
DATE OF OPERATION:
SURGEON:                  MAURICE MCCREARY, M.D.
ROOM NUMBER:

PREOPERATIVE DIAGNOSIS:
Status osteomyelitis, left foot.

POSTOPERATIVE DIAGNOSIS:
1.    Failed Port-A-Cath.
2.    Insensate left foot.

PROCEDURE:
Removal of Port-A-Cath.

ANESTHESIA:
Local

FIRST ASSISTANT:
Simo, MS3

ANESTHESIOLOGIST:
MAURICE MCCREARY, M.D.

INDICATIONS:  The patient is a 37-year-old black male who presents for
removal of his Port-A-Cath after receiving 12 weeks of IV antibiotic
therapy for osteomyelitis.

TECHNICAL DESCRIPTION:   The patient was placed supine and the left
anterior chest wall was prepped and draped in the usual sterile
manner.   The area of the reservoir was in the left infraclavicular
fossa.   This area was infiltrated in the old incision with a local of
1% Xylocaine containing epinephrine.

An incision was made and carried down to the capsule of the Port-A-
Cath.   Then using sharp and blunt dissection the eye of the reservoir
was visualized.   A towel clip was placed through the eye for better
traction.   The port was then dissected from the capsule.   It was then
gently removed from the insertion site.   Pressure was placed on the
insertion site.

The patient's head was positioned in the reverse Trendelenburg
position up.  Hemostasis was adequate.   Electrocautery was used to
control hemostasis in the pocket.   The wound was then closed in layers
using 3-0 Vicryl in the deeper layers and 4-0 Vicryl in the
subcuticular layers.   Steri-Strips were used for good skin

G.S.E. H
APP. # 13                    00173

PATIENT NAME:  DAVIS, LAWRENCE
MEDICAL RECORD NUMBER:    00887863

**PAGE 2**

approximation.  A sterile Op-Site dressing was placed.  The patient
tolerated the procedure well and was taken to the ambulatory surgery
unit in satisfactory condition.


MM/ddi/ub
D:04/22/02
T:04/23/02                MAURICE MCCREARY, M.D.
BY:0566
1O/0WZ9H/J:1440
XZ:#1141440.4M2

G. S. E. H.
APP. # 14

LETTER TO DR. McCREARY

Appendix Pages

Dear Dr. Maurice McCreary,
Medical Surgeon;

May 31, 2002

Mr. Lawrence Davis Jr.
#250-665 Med 82/Rm #6
1901 E. ST. S.E.
CCA/CTF

I'm writting you enquiring for help in my medical situation being that you are the performing surgeon and are aware of my condition pertaining to my heft foot's heel.

There seems to be a failure to carry out your medical orders & medicational prescriptions as to your professional prognosis and diagnosis here at CCA/CTF, facility, upon which the medical staff here has neglected, and now! having caused further infection and newly present bacteria (stafylacoccus aurera) due to inappropriate cleansing via non sterile bandages & failure to provide or order medications as prescribed.

Eleven days prior to our 5-28-02 scheduled appointment up until this present day 5-31-02 there has been no fufilling of your consultation written prescriptions.

Dr. McCreary the medical shoes that I was fitted for as prescribed by the ortho/prosthesis doctor you

G.S.E.H.  App# 7A
The letter

designated me to visit in G.S.E.H. has also been neglected
to be purchased by this Detention Facility (CCA/CTF) and at
no fault of yours, However my purpose of mentioning
this Is to give you an Idea of the neglect I am suffer
ing at this facility.

Please know, that this letter Is solely
for the purpose, concern and fear of my losing my
left foot and leg, of which I know, only you have shown
great concern and efforts taken to prevent the loss of
my limb and therefore, I humbly request your help In
any way possible, or as you deem appropriate as to the
proper Medical staff admin. In Question & Remedy of the
failed treatment I am receiving at CCA/CTF.

Thanking You Aforetime
Mr. Lawrence Davis Jr.
#250-665 Medical 8a
Dm#E.

G.S.E.H

App #4B
The letter

CC: Attorney

CORRECTIONS CORPORATION OF AMERICA
(CCA)

Appendix Pages

04-01-02A10:58 RCVD

Form 14-5A – Official Use Only
Grievance No.: 0705640

## CCA INMATE/RESIDENT GRIEVANCE FORM

NAME: DAVIS JR.        LAWRENCE        —
         LAST NAME           FIRST           MIDDLE INITIAL

NUMBER: 250-665

HOUSING ASSIGNMENT: MED. 82 cell 6

### STATE GRIEVANCE
(Include documentation, witness's date of incident and any other information pertaining to the grievance subject.
Attach additional pages (if necessary).

ON SEVERAL OCCASIONS I WAS GIVEN DIFFERENT ANTIBIOTIC
by MEDICAL STAFF out SIDE OF THE PRESCRIBED
Antibiotics by DR. MCREARY SURGEON At G.S.E.H
on 3-27-02 I WASN'T GIVEN THE I.V. Antibiotic AND AS OF
3-26-02 I HAVE NOT RECEIVED ANY Antibiotic to continue
THE HEALING OF MY (L) FOOT. DR. MCREARY SENT ORDERS BACK
IN MY MEDICAL FILE THAT ARE NOT BEING CARRIED out.

### REQUESTED ACTION:

Lawrence Davis, JP.                    3-28-02
Inmate/Resident's Signature            Date Submitted

C C A/CTE
APP. # 1

### GRIEVANCE OFFICER'S REPORT:

Pt. received 10 day each of Keflex
and Flagyl after GSEH discharge
3/9/02 per Dr. McCreary, surgeon. No
new antibiotics were ordered. This
was verified again today per tele-
phone conversation with Dr. McCreary.
Pt. was advised again of this.
                              P. Mugill, MD.

PICTURES OF LEFT HEEL WOUND

TAKEN AT

GREATER SOUTHEAST COMMUNITY HOSPITAL

Appendix Pages



EXHIBIT A

EXHIBIT B

EXHIBIT C

EXHIBIT D



- EXHIBIT E

**SPRINGFIELD MEDICAL CENTER FOR
FEDERAL PRISONERS**

**Appendix Pages**

Page 3 - History and Physical
USMCFP - Springfield, MO

TEMPERATURE: 97.5
PULSE: 97
BLOOD PRESSURE: 140/88

**GENERAL APPEARANCE AND MENTAL STATUS:** This is a well-nourished, well-developed, black male in no acute distress at this time.

| | |
|---|---|
| HEAD AND NECK: | Normocephalic. Neck is supple, freely movable without masses. |
| EYES: | He has diminished visual acuity with good correction. EOMI; PERRLA; peripheral vision intact. Sclera and conjunctiva are clear. Fundi benign. |
| EARS: | TMs and canals are intact and clear. Whisper test satisfactory. |
| NOSE: | Patent; no septal defect, mucous membranes are pink and moist. |
| OROPHARYNX: | Mucosa pink and moist without lesions or exudate. Teeth in fair repair. Posterior pharynx clear. |
| CHEST: | Symmetrical expansion. No increased AP diameter. |
| LUNGS: | Clear to auscultation. |
| CARDIOVASCULAR: | Heart is regular rate and rhythm without murmurs. S1 and S2 present. Peripheral pulses are 2+/4. No carotid bruits. |
| ABDOMEN: | Normal bowel sounds. Soft and nontender. No masses, organomegaly, or bruits auscultated. |
| HERNIAS: | No bulges palpated on cough or strain. |
| GENITALIA: | Not examined. |
| RECTUM: | Not examined. |
| PROSTATE: | Not examined due to lack of privacy in the locked unit. |
| BACK: | Normal curvature with good range of motion. Nontender to percussion. |
| EXTREMITIES: | He presents with a healing plantar calcaneal ulcer that is now covered with hyperkeratotic tissue and a depressed center. There is no surrounding erythema and it appears to be neurovascularly intact. |

SPRINGFIELD, MO
APP # 1

Antonio J. Alburquerque, P.A.

DAVIS, Lawrence

February 12, 2003

Reg. No. 13158-007

SENSITIVE - LIMITED OFFICIAL USE

000075

Page 4 - History and Physical
USMCFP - Springfield, MO

Symmetrical appearing with full range of motion and adequate strength.

NEUROLOGICAL:  Cranial nerves II-XII grossly intact.  No sensory or motor deficits. DTRs 2+/4 throughout.  No tremors noted.

SKIN:  Normal color and tone.

LYMPHATICS:  No lymphadenopathy palpable.

**IMPRESSION:**
1. This is an alert and oriented individual who has a history of left calcaneal ulceration that is healed at this time.  He has a history of calcaneal osteomyelitis and it appears to be resolving.
2. History of hypertension.

**PLAN:**  This patient has been given a bone scan test to determine the possibility of a still lingering osteomyelitis whether this proofs to be negative the patient should be discharged.


_____
Antonio J. Alburquerque, P.A.


_____
Mark A. Pearson, M.D.
Staff Physician

AJA/MAP/vf
D: 02-12-03
T: 02-13-03
R: 02-19-03


SPRINGFIELD, MO
APP. # 2

Antonio J. Alburquerque, P.A.

DAVIS, Lawrence

February 12, 2003

Reg. No. 13158-007

SENSITIVE - LIMITED OFFICIAL USE

00076

*PAGE 5 - History*

## U.S. MEDICAL CENTER FOR FEDERAL PRISONERS
## SPRINGFIELD, MISSOURI

### NUCLEAR MEDICINE

**NAME:** DAVIS, LAWRENCE  (7/18/64)
**REG NO:** 13158-007
**WARD:** 1-3

**REQUESTED BY:** A. Alburquerque / Dr. Pearson
**DATE OF REQUEST:** 2/6/03
**DATE OF PROCEDURE:** 2/12/03

**CLINICAL INFORMATION:** Open wound of the plantar surface of the left heel for two to three years. Evaluate for possible osteomyelitis.

## RADIONUCLIDE THREE-PHASE BONE SCAN

Following bolus administration of 20.9 mCi of 99mTc MDP, rapid sequential imaging was obtained over the anterior and posterior aspects of the distal lower extremities to include the distal tibia, fibula, ankle, and foot regions.

There is intense focal increase of perfusion to the left midfoot region with subsequent blood pool demonstrating marked increase over the lateral aspect of the left tarsal bones. There is focal increase of tracer of a mild degree in soft tissues of the left heel.

Delayed high-resolution osseous phase imaging demonstrates intense accumulation of tracer in the tuberosity of the left cuboid bone and in the superior medial aspect of the cuboid bone. There is modest linear accumulation of tracer at the inferior aspect of the calcaneal tuberosity. No abnormalities observed in the right foot.

**IMPRESSION:** Abnormal study demonstrating findings consistent with osteomyelitis involving the left cuboid bone. Soft tissue inflammation/cellulitis is apparent at the left heel with a mild reactive periostitis. There is no evidence to suggest osteomyelitis of the calcaneus.

Robert E. Sonnemaker, M.D.
Nuclear Medicine Consultant

RES/la
D: 2/12/03
T: 2/13/03

SPRINGFIELD, MO
APP. # 3

SENSITIVE - LIMITED OFFICIAL USE

00051

NSN 7540-00-634-4176

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE | 600- |

| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION *(Sign each entry)* |

### INVASIVE PROCEDURE DOCUMENTATION

**4/8/03**

Arrived via: (Ambulatory)    Wheelchair    Stretcher

From ward: 1-4          Allergies NKA

Name of procedure: PICC line procedure

Physician: Hipsh          Consent signed: (Yes)    No

Monitors applied: (BP)    (P)    (Pulse Ox)    (Cardiac)

| 1310 | 145/85 | P62 SAT 95% RA |
| 1315 | 138/80 | P66 SAT 95% Dr Hipsh here explains procedure |
| 1300 | 184/85 | P65 SAT 95% RA will prep (L) AC site |
| 1325 | 140/22 | P66 sat 99% (R) AC site prep drape |
| | 119/65 | procedure began |
| 1330 | line placed flush per protocol 127/88 P63 SAT 98% sutures line in place line |
| 1335 | 146/81 | P63 SAT 98% cont to suture L3 in place |

Chest x-ray taken: (Yes)    No    N/A

Specimen to lab:    Yes    (No)    N/A

Released via: (Ambulatory)    Wheelchair    Stretcher

To ward: 1-4          Report given to: M. Farmer RN

Signature of nurse: C. [signature] RN

| 1340 | line flushed entire catheter 55cm (L) lateral cephalic vein Chest Xray being taken upper arm circ 14" |
| 1365/82 | P65 SAT 95% Xray taken → |

PATIENT'S IDENTIFICATION (Use this space for Mechanical Imprint)

SPRINGFIELD, MO
APP. #4

DAVIS, LAWRENCE
13153-007
MCFP SPG MO
DOB 7-18-54

| RECORDS MAINTAINED AT: | ▶ | | |
| PATIENT'S NAME (Last, First, Middle initial) | | | SEX |
| RELATIONSHIP TO SPONSOR | | STATUS | RANK/GRADE |
| SPONSOR'S NAME | | | ORGANIZATION |
| DEPART./SERVICE | SSN/IDENTIFICATION NO. | | DATE OF BIRTH |

000031

| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT TREATING ORGANIZATION (Sign each entry) |
|------|---------------------------------------------------------------------------|

4/7/03

ID Consult dictated

Imp) D chronic oster of D foot
       - likely 2° to foot drop & neuropathy
       resulting from LLE trauma in 1986

Plan) 1st) ① Orthopedic consult
       ② I would like to hold off on dx
           until we make a microbiologic
           diagnosis.
       ③ F/U in 4 weeks

                                    Edwards MD

Amendment

Pt had biopsy done July 2002 which
grew Enterobacter & Klebsiella.
Will cancel ortho consult, place
PICC & tx for at least 6 weeks. If
pt fails tx we may need ortho consult
in future.

Orders
       ① PICC placement for IV antibiotics      noted
       ② Levaquin 500 mg po q 24°              2 Mott
       ③ cefepime 2 gm IV q12°                 4-7-03
                                               1745

FAXED

                                    R Swords MD

ROBERT SWORDS, M.D.
       Consultant

SPRINGFIELD, MO
APP. # 5

FAXED

DAVIS, LAURENCE
13158-007
MCFP SPG MO
DOB 7-18-54

1-4

FPI, LEX.  Printed on Recycled Paper

DATE: 4-7-03  INIT:

STANDARD FORM 600 (REV. 6-97) BACK

PHARMACY COPY

000032

RECORD

mcr

## Prescriptions

| Order Date / Exp Date / RX # | Drug | Time | 28 | 29/03 | 30 | 01 | 02 | 03 | 0 |
|---|---|---|---|---|---|---|---|---|---|
| 4-7-03 | Cefepime IV 2 Grams ₓ 120 | 06 | W | BURNS | W BV | CR | CR | C |
| | | 18 | CK | SB | SB | N | CK | CK |
| 4/7 | PICC Line flush 2.5cc Heparin (100u/ml) | 06 | W | BV | W BV BV | CR | CR | C |
| | | 18 | CK | SB | SB | N | CK | UN | CK |

| | | | 5/5 | 5/6 | 5/7 | 5/8 | 5/9 | 5/10 | 5/ |
|---|---|---|---|---|---|---|---|---|---|
| Cefepime IV 2 Gm q 120 | | 0600 | CR | CR | BV BV | BV | CR | CR | CK |
| | | 180 | SB | SB | SB | SB | SB | UN | CK |
| Cefepime IV 2 Gm q 120 | | 06 | 5/12/03 CR | 5/13/03 BV | 5/14 BV | 5/15 BV | 5/16 CR | 5/17 BV | 5/ CR |
| | | 180 | SB | SB | SB | SB | SB | UN | N |
| 4-7 Exp 5-25 | Cefepime IV 2 gm q 120 | | 5/12 5/19/03 | 5/13 5/20 | 5/14 5/21 | 5/15 5/22 | 5/16 5/22 | 5/17 5/24 | 5/ 5/ |
| | | 06 | W | BV | BV | BV | BV | CR | CR |
| | | 18 | SB | SB | SB | SB | UN | | V |

SPRINGFIELD, MO
APP. # 6

Documentation Codes:  **H** - Hold   **R** - Refuse   CC

DOB
HT.                    WT.
Physician
Pt. Name  DAVIS, LAWRENCE            Registration #  131582007            000054

**U.S. MEDICAL CENTER FOR FEDERAL PRISONERS**
**SPRINGFIELD, MISSOURI**

**NUCLEAR MEDICINE**

**NAME:**  DAVIS, LAWRENCE  (7/18/64)
**REG NO:**  13158-007
**WARD:**  S03

**REQUESTED BY:**          Dr. Pearson
**DATE OF REQUEST:**      5/5/03
**DATE OF PROCEDURE:**   5/7/03

**CLINICAL INFORMATION:**  Evaluate left foot with comparison to previous examination.

### THREE-PHASE BONE SCAN

Following bolus intravenous infusion of 19.7 mCi of 99mTc, rapid sequential imaging was obtained anteriorly and posteriorly over the distal extremities to include the ankles and feet . There is a subtle relative decrease of perfusion in the left foot.  Modest irregularity of tracer is observed in perfusion distribution.  Immediate blood pool imaging demonstrates modest focal increase over the left cuboid bone and right mid metatarsal regions.  Delayed osseous-phase imaging demonstrates focal increase of tracer in the left cuboid bone and in the inferior aspect of the calcaneus at the tibiotalar joint.

Comparison with the previous examination of 02-12-03, demonstrates remarkable decrease of focal increase in perfusion and blood pool over the cuboid region and marked decrease of increased osseous turnover of the left cuboid.

IMPRESSION:  Today's examination demonstrates a marked reduction in the inflammatory process involving the left cuboid bone.

**Robert E. Sonnemaker, M.D.**
Nuclear Medicine Consultant

RES/la
D: 5/8/03
T: 5/8/03

SPRINGFIeld, MO

APP. # 10

WMP

00048

SENSITIVE - LIMITED OFFICIAL USE

U. S. MEDICAL CENTER FOR FEDERAL PRISONERS

**LABORATORY, 1900 W. SUNSHINE**
**SPRINGFIELD, MISSOURI 65808**
**(417) 862-7041, EXT. 454**

Page: 1

```
-------------------------  F I N A L    R E P O R T  -------------------------
Register Number: 13158-007
Name        : DAVIS,LAWRENCE                    Age              : 38
Location    : S03                               Sex              : M
Physician   : DR. PEARSON                       Accession Number: 6868
Collection Date: 06/02/2003                     "X" if Complete :  [X]
Collection Time: 14:31
Tests   | KOD. PANEL; CBC
Ordered |
-------------------------------------------------------------------------------
```

| Test Name | Result | Flag | | Reference Range | | Tech |
|-----------|--------|------|--|-----------------|--|------|
| Collection Cmt. | Drawn by PB |  | | | | TE |
|  | CALL RESULTS TO DR. PEARSON | | | | | |
|  | RESULTS CALLED TO DR. JONES | | | | | |
|  | SINCE HE IS COVERING FOR | | | | | |
|  | DR. PEARSON. 6/2/03 TE 14:52 | | | | | |
| KOD. PANEL | | | | | | |
| Glucose | 96 | | mg/dL | 70 | – 110 | SY TE |
| Urea Nitrogen | 9 | | mg/dL | 7 | – 22 | SY TE |
| Creatinine | 0.9 | | mg/dL | 0.6 | – 1.6 | SY TE |
| Uric Acid | 6.9 | | mg/dL | 3.7 | – 8.6 | SY TE |
| SodiumI | 148 | | mmol/L | 137 | – 148 | SY TE |
| Potassium | 3.8 | | mmol/L | 3.5 | – 5.0 | SY TE |
| Chloride1 | 106 | | mmol/L | 99 | – 114 | SY TE |
| Phosphorus | 2.8 | | mg/dL | 2.5 | – 4.5 | SY TE |
| Calcium1 | 9.7 | | mg/dL | 8.5 | – 10.9 | SY TE |
| Total Protein | 8.0 | | g/dL | 6.0 | – 8.2 | SY TE |
| Albumin | 4.2 | | g/dL | 3.6 | – 5.1 | SY TE |
| Alkaline Phos. | 91 | | U/L | 41 | – 133 | SY TE |
| AST(SGOT) | 27 | | U/L | 11 | – 55 | SY TE |
| LDH | 757 | HI | U/L | 354 | – 705 | SY TE |
| Total Bilirubin1 | 0.20 | | mg/dL | 0.20 | – 1.30 | SY TE |
| Cholesterol | 159 | | mg/dL | 140 | – 200 | SY TE |
| Triglycerides | 82 | | mg/dL | 30 | – 200 | SY TE |
| Carbon Dioxide1 | 28 | | mmol/L | 22 | – 30 | SY TE |
| A/G Ratio | 1.11 | | | 1.00 | – 2.30 | TX TE |
| Globulin | 3.8 | HI | | 2.0 | – 3.7 | TX TE |
| CBC | | | | | | |
| White Blood Cell | 5.3 | | 10×3/uL | 4.3 | – 11.1 | GK TE |
| Red Blood Cells | 5.01 | | 10×6/uL | 4.46 | – 5.78 | GK TE |
| Hemoglobin | 14.1 | | g/dL | 13.6 | – 17.6 | GK TE |
| Hematocrit | 43.4 | | % | 40.2 | – 51.4 | GK TE |
| MCV | 86.5 | | fL | 82.5 | – 96.5 | GK TE |
| MCH | 28.2 | | pg | 27.1 | – 34.3 | GK TE |
| MCHC | 32.5 | LO | g/dL | 33.0 | – 35.0 | GK TE |
| RDW | 13.7 | | % | 12.0 | – 14.0 | GK TE |
| PLT | 173 | | 10×3/uL | 130 | – 374 | GK TE |

```
Name     : DAVIS, LAWRENCE              Doctor  : DR. PEARSON
Register#: 13158-007                    Location: S03
Printed  : 06/02/2003 @ 16:10                    ........
                                        Sensitive L.O.U.
```

*SPRINGFIELD, MO*

*APP. # 11*

00040

U. S. MEDICAL CENTER FOR FEDERAL PRISONERS
LABORATORY, 1900 W. SUNSHINE
SPRINGFIELD, MISSOURI 65808
(417) 862-7041, EXT. 454

============== F I N A L   R E P O R T ==============

Register Number: 13158-007                     Age            : 38
Name         : DAVIS, LAWRENCE                  Sex            : M
Location     : S03                              Accession Number: 6868
Physician    : DR. PEARSON                      "X" if Complete :  [X]
Collection Date: 06/02/2003
Collection Time: 14:31
Tests  ¦ KOD. PANEL; CBC
Ordered¦

=====================================================================

| Test Name | Result | Flag | Reference Range | | | Tech |
|-----------|--------|------|------|---|------|------|
| MPV | 7.4 | | fL | 6.9 | – | 10.5 | GK TE |
| AUTOMATED DIFF | | | | | | |
| Neutrophils | 49.3 | | % | 43.0 | – | 67.0 | GK TE |
| Lymphocytes | 36.4 | | % | 21.0 | – | 45.0 | GK TE |
| Monocytes | 11.9 | | % | 5.0 | – | 13.0 | GK TE |
| Eosinophils | 1.3 | | % | 0.0 | – | 7.0 | GK TE |
| Basophils | 1.1 | HI | % | 0.0 | – | 1.0 | GK TE |
| Neutrophil # | 2.6 | | 10^3/uL | 1.9 | – | 6.7 | GK TE |
| Lymphocyte # | 1.9 | | 10^3/uL | 1.3 | – | 3.7 | GK TE |
| Monocyte # | 0.6 | | 10^3/uL | 0.3 | – | 1.1 | GK TE |
| Eosinophil # | 0.1 | | 10^3/uL | 0.0 | – | 0.5 | GK TE |
| Basophil # | 0.1 | | 10^3/uL | 0.0 | – | 0.1 | GK TE |

-- End of Laboratory Report --

Name      : DAVIS, LAWRENCE           Doctor  : DR. PEARSON
Register#: 13158-007                  Location: S03
Printed  : 06/02/2003 @ 16:10         .........
                                      Sensitive L. O. U.

< SPRINGFIELD, MO
APP. # 12

00041

| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT TREATING ORGANIZATION *(Sign each entry)* |
|------|---|
| 6-4-03 1035 | S/O - I'm finished ē this line A: Pic line P: removed Pic line @ A/c space, no S/S infection Pt. tolerated well. covered ē 4x4 - kalrey. ———→ D.Washk P. Weskamp |
| 7-22-03 0900 | T 974  P 63  R 20  B/P 115/68  left ...  C. GARNER, NA  CLINICAL TECH. |
| | S: Pt says he feels fine, wants to know if he can be dictated out. Says he has finished his IV antibiotics, and wants to return to his parent institution. |
| | O: No new lab. |
| | A: 1. S/p full course of antibiotics for osteomyelitis of left cuboid bone, recovered. |
| | P: 1. No new orders. |
| | 2. Return to clinic in 90 days. |
| | E: Discussed the fact that he needs to see Dr. Swords again for followup before he can be dictated. Pt understands and agrees.  M.A. PEARSON, M.D.  MEDICAL OFFICER |

## U.S. MEDICAL CENTER FOR FEDERAL PRISONERS
## SPRINGFIELD, MISSOURI
## REHABILITATION DEPARTMENT
Initial __✓__, Progress_____, Discharge __✓__

PMHx: S/P ℗ thigh GSW c̄ neurotrauma — consequent ℗ foot drop since 1986 — hx of osteomylitis ℗ heel — continues to ambulate dispite this.

S: Request high top shoe — light weight for ℗ foot drop.

O: Ambulates to clinic
wearing 6" high — high-top New Balance tennis shoe
Pt declines to wear a custom AFO
current shoe fit & size is appropriate
℗ dorsiflexion = 0/5 — ∅ voluntary movement
∅ pain

A: ① Current footwear is appropriate
② Would recommend custom AFO
③ Does not require an extra-depth or width shoe/boot — Pt understands
Goals: education — met

P: D/C P.T. @ this time

**Original - Medical Record**
**Copy - Physical Therapy** ✔
**- Prosthetics/Orthotics** ___
**- Occupational Therapy** ___
**- Speech Therapy** ___

_____
Signature

Physician _D. Pearm / Pt Albuquerque_          Date _6/10/03_

Patient Identification _Davis, Lawrence / 13158-007_   Ward _503_
_SPRINGFIELD, MO_
_APP #14_

**SPG-75**
**(Revised 07/02)**

NSN 7540-00-634-4176

AUTHORIZED FOR LOCAL REPRODUCTION

| MEDICAL RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE |
|---|---|
| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT  TREATING ORGANIZATION (Sign each entry) |

5M03    DD

1400    N/O ch. lower pain, +/c, sweats,
N/V/D, nasal, sore throat
Completed abx.

CV-RRR
lungs CTA
old soft tv

(L) foot s̄ erythema (last fluctuance o
d/c

A/P (L) osteo. foot resolved
ok for d/c / transfer
from my standpoint

ROBERT SWORDS, M.D.
Consultant

| HOSPITAL OR MEDICAL FACILITY | STATUS | DEPART./SERVICE | RECORDS MAINTAINED AT |
|---|---|---|---|
| SPONSOR'S NAME | SSN/ID NO. | RELATIONSHIP TO SPONSOR | |

PATIENT'S IDENTIFICATION: (For typed or written entries, give: Name - last, first, middle; ID No or SSN; Sex; Date of Birth; Rank/Grade.)  |  REGISTER NO.  |  WARD NO.

DAVIS, LAWRENCE
13153-007
MCFP SPG MO
DOB 7-13-54

SPRINGFIELD, MO
APP. #15

LOGICAL RECORD OF MEDICAL CARE
Medical Record
'DARD FORM 600 (REV. 6-97)
ed by GSA/ICMR
(41 CFR) 201-9.202-1

USP LVN

PRINTED ON RECYCLED PAPER

BP-S149.060 **MEDICAL RECORD OF FEDERAL PRISONER IN TRANSIT** CDFRM
JUL 96
**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| **TB Clearance** | |
| --- | --- |

**PPD Completed:** _____
                  Date
**Results:** _____ mm

**Interpreted as:** _____
(Positive or Negative)

**CXR Completed:** _____
                  (Date)
**Results:** _____

Note: Date(s) listed above must be within one year of this transfer.

**No inmate may be transferred to any BOP facility unless either PPD or CXR results are satisfactory for medical clearance.**

**Name:** _____  **Reg. No.** _____

**Departed From:** _____  **Date Departed:** _____

**Destination:** _____  **Reason for Transfer:** _____
        Name of Institution

**Special Instructions:** **Blood and Body Fluid Precautions** _____
                          _____
                          _____

**Diagnoses:** 1. _____  4. _____
             2. _____  5. _____
             3. _____  6. _____

### MEDICATION FOR CARE ENROUTE

| Medication | Dose | Route | Instructions for Use (Include proper time for administering) | Stop |
| --- | --- | --- | --- | --- |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

| Signature of Certifying Medical Staff Member | Title | Date Signed |
| --- | --- | --- |
|  |  |  |

### PROGRESS NOTES ENROUTE

| Date | Time | Institution | Symptoms, Findings, Medications, Treatment, Order, Etc. |
| --- | --- | --- | --- |
|  |  |  |  |

SPRINGFIELD, MO
App. #16

Attach SF-600 if additional space is required.

Record copy - Transporting Officer; Copy - Health Record (Top page, Position one); Copy - Transferring institution

(This form may be replicated via WP)    This form replaces BP-149.060 and BP-S149.060 dtd Nov 1994


Printed on Recycled Paper

UNASYN

Appendix Pages

70-4361-44-4

# UNASYN®
## (ampicillin sodium/sulbactam sodium)

To reduce the development of drug-resistant bacteria and maintain the effectiveness of UNASYN® and other antibacterial drugs, UNASYN should be used only to treat or prevent infections that are proven or strongly suspected to be caused by bacteria.

## DESCRIPTION

UNASYN is an injectable antibacterial combination consisting of the semisynthetic antibiotic ampicillin sodium and the beta-lactamase inhibitor sulbactam sodium for intravenous and intramuscular administration.

Ampicillin sodium is derived from the penicillin nucleus, 6-aminopenicillanic acid. Chemically, it is monosodium (2S, 5R, 6R)-6-[(R)-2-amino-2-phenylacetamido]-3, 3-dimethyl-7-oxo-4-thia-1-azabicyclo[3.2.0]heptane-2-carboxylate and has a molecular weight of 371.39. Its chemical formula is $C_{16}H_{18}N_3NaO_4S$. The structural formula is:

Sulbactam sodium is a derivative of the basic penicillin nucleus. Chemically, sulbactam sodium is sodium penicillinate sulfone; sodium (2S, 5R)-3,3-dimethyl-7-oxo-4-thia- 1-azabicyclo [3.2.0] heptane-2-carboxylate 4,4-dioxide. Its chemical formula is $C_8H_{10}NNaO_5S$ with a molecular weight of 255.22. The structural formula is:



UNASYN, ampicillin sodium/sulbactam sodium parenteral combination, is available as a white to off-white dry powder for reconstitution. UNASYN dry powder is freely soluble in aqueous diluents to yield pale yellow to yellow solutions containing ampicillin sodium and sulbactam sodium equivalent to 250 mg ampicillin per mL and 125 mg sulbactam per mL. The pH of the solutions is between 8.0 and 10.0.

Dilute solutions (up to 30 mg ampicillin and 15 mg sulbactam per mL) are essentially colorless to pale yellow. The pH of dilute solutions remains the same.

1.5 g of UNASYN (1 g ampicillin as the sodium salt plus 0.5 g sulbactam as the sodium salt) parenteral contains approximately 115 mg (5 mEq) of sodium.

3 g of UNASYN (2 g ampicillin as the sodium salt plus 1 g sulbactam as the sodium salt) parenteral contains approximately 230 mg (10 mEq) of sodium.

## CLINICAL PHARMACOLOGY

**General:** Immediately after completion of a 15-minute intravenous infusion of UNASYN, peak serum concentrations of ampicillin and sulbactam are attained. Ampicillin serum levels are similar to those produced by the administration of equivalent amounts of ampicillin alone. Peak ampicillin serum levels ranging from 109 to 150 mcg/mL are attained after administration of 2000 mg of ampicillin plus 1000 mg sulbactam and 40 to 71 mcg/mL after administration of 1000 mg ampicillin plus 500 mg sulbactam. The corresponding mean peak serum levels for sulbactam range from 48 to 88 mcg/mL and 21 to 40 mcg/mL, respectively. After an intramuscular injection of 1000 mg ampicillin plus 500 mg sulbactam, peak ampicillin serum

2

levels ranging from 8 to 37 mcg/mL and peak sulbactam serum levels ranging from 6 to 24 mcg/mL are attained.

The mean serum half-life of both drugs is approximately 1 hour in healthy volunteers.

Approximately 75 to 85% of both ampicillin and sulbactam are excreted unchanged in the urine during the first 8 hours after administration of UNASYN to individuals with normal renal function. Somewhat higher and more prolonged serum levels of ampicillin and sulbactam can be achieved with the concurrent administration of probenecid.

In patients with impaired renal function the elimination kinetics of ampicillin and sulbactam are similarly affected, hence the ratio of one to the other will remain constant whatever the renal function. The dose of UNASYN in such patients should be administered less frequently in accordance with the usual practice for ampicillin (see DOSAGE and ADMINISTRATION).

Ampicillin has been found to be approximately 28% reversibly bound to human serum protein and sulbactam approximately 38% reversibly bound.

The following average levels of ampicillin and sulbactam were measured in the tissues and fluids listed:

### TABLE A
### Concentration of UNASYN in Various Body Tissues and Fluids

| Fluid or Tissue | Dose (grams) Ampicillin/Sulbactam | Concentration (mcg/mL or mcg/g) Ampicillin/Sulbactam |
|---|---|---|
| Peritoneal Fluid | 0.5/0.5 IV | 7/14 |
| Blister Fluid (Cantharides) | 0.5/0.5 IV | 8/20 |
| Tissue Fluid | 1/0.5 IV | 8/4 |
| Intestinal Mucosa | 0.5/0.5 IV | 11/18 |
| Appendix | 2/1 IV | 3/40 |

Penetration of both ampicillin and sulbactam into cerebrospinal fluid in the presence of inflamed meninges has been demonstrated after IV administration of UNASYN.

The pharmacokinetics of ampicillin and sulbactam in pediatric patients receiving UNASYN are similar to those observed in adults. Immediately after a 15-minute infusion of 50 to 75 mg UNASYN/kg body weight, peak serum and plasma concentrations of 82 to 446 mcg ampicillin/mL and 44 to 203 mcg sulbactam/mL were obtained. Mean half-life values were approximately 1 hour.

3

# MICROBIOLOGY

Ampicillin is similar to benzyl penicillin in its bactericidal action against susceptible organisms during the stage of active multiplication. It acts through the inhibition of cell wall mucopeptide biosynthesis. Ampicillin has a broad spectrum of bactericidal activity against many gram-positive and gram-negative aerobic and anaerobic bacteria. (Ampicillin is, however, degraded by beta-lactamases and therefore the spectrum of activity does not normally include organisms which produce these enzymes.)

A wide range of beta-lactamases found in microorganisms resistant to penicillins and cephalosporins have been shown in biochemical studies with cell free bacterial systems to be irreversibly inhibited by sulbactam. Although sulbactam alone possesses little useful antibacterial activity except against the *Neisseriaceae*, whole organism studies have shown that sulbactam restores ampicillin activity against beta-lactamase producing strains. In particular, sulbactam has good inhibitory activity against the clinically important plasmid mediated beta-lactamases most frequently responsible for transferred drug resistance. Sulbactam has no effect on the activity of ampicillin against ampicillin susceptible strains.

The presence of sulbactam in the UNASYN formulation effectively extends the antibiotic spectrum of ampicillin to include many bacteria normally resistant to it and to other beta-lactam antibiotics. Thus, UNASYN possesses the properties of a broad-spectrum antibiotic and a beta-lactamase inhibitor.

While *in vitro* studies have demonstrated the susceptibility of most strains of the following organisms, clinical efficacy for infections other than those included in the indications section has not been documented.

**Gram-Positive Bacteria:** *Staphylococcus aureus* (beta-lactamase and non-beta-lactamase producing), *Staphylococcus epidermidis* (beta-lactamase and non-beta-lactamase producing), *Staphylococcus saprophyticus* (beta-lactamase and non-beta-lactamase producing), *Streptococcus faecalis*[†] (Enterococcus), *Streptococcus pneumoniae*[†] (formerly *D. pneumoniae*), *Streptococcus pyogenes*[†], *Streptococcus viridans*[†].

**Gram-Negative Bacteria:** *Hemophilus influenzae* (beta-lactamase and non-beta-lactamase producing), *Moraxella (Branhamella) catarrhalis* (beta-lactamase and non-beta-lactamase producing), *Escherichia coli* (beta-lactamase and non-beta-lactamase producing), *Klebsiella* species (all known strains are beta-lactamase producing), *Proteus mirabilis* (beta-lactamase and non-beta-lactamase producing), *Proteus vulgaris, Providencia rettgeri, Providencia stuartii, Morganella morganii,* and *Neisseria gonorrhoeae* (beta-lactamase and non-beta-lactamase producing).

4

**Anaerobes:** *Clostridium* species[†], *Peptococcus* species[†], *Peptostreptococcus* species, *Bacteroides* species, including *B. fragilis*.

[†] These are not beta-lactamase producing strains and, therefore, are susceptible to ampicillin alone.

## Susceptibility Testing

**Diffusion Technique:** For the Kirby-Bauer method of susceptibility testing, a 20 mcg (10 mcg ampicillin + 10 mcg sulbactam) diffusion disk should be used. The method is one outlined in the NCCLS publication M2-A4.[1] With this procedure, a report from the laboratory of "Susceptible" indicates that the infecting organism is likely to respond to UNASYN therapy and a report of "Resistant" indicates that the infecting organism is not likely to respond to therapy. An "Intermediate" susceptibility report suggests that the infecting organism would be susceptible to UNASYN if a higher dosage is used or if the infection is confined to tissues or fluids (e.g., urine) in which high antibiotic levels are attained.

**Dilution Techniques:** Broth or agar dilution methods may be used to determine the minimal inhibitory concentration (MIC) value for susceptibility of bacterial isolates to ampicillin/sulbactam. The method used is one outlined in the NCCLS publication M7-A2.[2] Tubes should be inoculated to contain $10^5$ to $10^6$ organisms/mL or plates "spotted" with $10^4$ organisms.

The recommended dilution method employs a constant ampicillin/sulbactam ratio of 2:1 in all tubes with increasing concentrations of ampicillin. MIC's are reported in terms of ampicillin concentration in the presence of sulbactam at a constant 2 parts ampicillin to 1 part sulbactam.

5

**Recommended ampicillin/sulbactam, Susceptibility Ranges[1,2,3]**

| | Resistant | Intermediate | Susceptible |
|---|---|---|---|
| *Gram(-) and Staphylococcus* | | | |
| Bauer/Kirby Zone Sizes | ≤11 mm | 12-13 mm | ≥14 mm |
| MIC (mcg of ampicillin/mL) | ≥32 | 16 | ≤ 8 |
| | | | |
| *Hemophilus influenzae* | | | |
| Bauer/Kirby Zone Sizes | ≤19 | — | ≥20 |
| MIC (mcg of ampicillin/mL) | ≥ 4 | — | ≤ 2 |

[1]The non-beta-lactamase producing organisms which are normally susceptible to ampicillin, such as *Streptococci*, will have similar zone sizes as for ampicillin disks.

[2]*Staphylococci* resistant to methicillin, oxacillin, or nafcillin must be considered resistant to UNASYN.

[3]The quality control cultures should have the following assigned daily ranges for ampicillin/sulbactam:

| | | Disks | Mode MIC (mcg/mL ampicillin/ mcg/mL sulbactam) |
|---|---|---|---|
| *E. coli* | (ATCC 25922) | 20-24 mm | 2/1 |
| *S. aureus* | (ATCC 25923) | 29-37 mm | 0.12/0.06 |
| *E. coli* | (ATCC 35218) | 13-19 mm | 8/4 |

## INDICATIONS AND USAGE

UNASYN is indicated for the treatment of infections due to susceptible strains of the designated microorganisms in the conditions listed below.

**Skin and Skin Structure Infections** caused by beta-lactamase producing strains of *Staphylococcus aureus, Escherichia coli,*\* *Klebsiella* spp.\* (including *K. pneumoniae*\*), *Proteus mirabilis,*\* *Bacteroides fragilis,*\* *Enterobacter* spp.,\* and *Acinetobacter calcoaceticus.*\*

NOTE: For information on use in pediatric patients see PRECAUTIONS–Pediatric Use and CLINICAL STUDIES sections.

**Intra-Abdominal Infections** caused by beta-lactamase producing strains of *Escherichia coli, Klebsiella* spp. (including *K. pneumoniae*\*), *Bacteroides* spp. (including *B. fragilis*), and *Enterobacter* spp.\*

6

**Gynecological Infections** caused by beta-lactamase producing strains of *Escherichia coli*,* and *Bacteroides* spp.* (including *B. fragilis*).

* Efficacy for this organism in this organ system was studied in fewer than 10 infections.

While UNASYN is indicated only for the conditions listed above, infections caused by ampicillin-susceptible organisms are also amenable to treatment with UNASYN due to its ampicillin content. Therefore, mixed infections caused by ampicillin-susceptible organisms and beta-lactamase producing organisms susceptible to UNASYN should not require the addition of another antibiotic.

Appropriate culture and susceptibility tests should be performed before treatment in order to isolate and identify the organisms causing infection and to determine their susceptibility to UNASYN.

Therapy may be instituted prior to obtaining the results from bacteriological and susceptibility studies, when there is reason to believe the infection may involve any of the beta-lactamase producing organisms listed above in the indicated organ systems. Once the results are known, therapy should be adjusted if appropriate.

To reduce the development of drug-resistant bacteria and maintain effectiveness of UNASYN and other antibacterial drugs, UNASYN should be used only to treat or prevent infections that are proven or strongly suspected to be caused by susceptible bacteria. When culture and susceptibility information are available, they should be considered in selecting or modifying antibacterial therapy. In the absence of such data, local epidemiology and susceptibility patterns may contribute to the empiric selection of therapy.

## CONTRAINDICATIONS

The use of UNASYN is contraindicated in individuals with a history of hypersensitivity reactions to any of the penicillins.

## WARNINGS

SERIOUS AND OCCASIONALLY FATAL HYPERSENSITIVITY (ANAPHYLACTIC) REACTIONS HAVE BEEN REPORTED IN PATIENTS ON PENICILLIN THERAPY. THESE REACTIONS ARE MORE APT TO OCCUR IN INDIVIDUALS WITH A HISTORY OF PENICILLIN HYPERSENSITIVITY AND/OR HYPERSENSITIVITY REACTIONS TO MULTIPLE ALLERGENS. THERE HAVE BEEN REPORTS OF INDIVIDUALS WITH A HISTORY OF PENICILLIN HYPERSENSITIVITY WHO HAVE EXPERIENCED SEVERE REACTIONS WHEN TREATED WITH CEPHALOSPORINS. BEFORE THERAPY WITH A PENICILLIN, CAREFUL INQUIRY SHOULD BE MADE CONCERNING PREVIOUS HYPERSENSITIVITY REACTIONS TO PENICILLINS, CEPHALOSPORINS, AND OTHER ALLERGENS. IF AN ALLERGIC REACTION OCCURS, UNASYN SHOULD BE DISCONTINUED AND THE APPROPRIATE THERAPY INSTITUTED.

SERIOUS ANAPHYLACTOID REACTIONS REQUIRE IMMEDIATE EMERGENCY TREATMENT WITH EPINEPHRINE. OXYGEN, INTRAVENOUS STEROIDS, AND AIRWAY MANAGEMENT, INCLUDING INTUBATION, SHOULD ALSO BE ADMINISTERED AS INDICATED.

**Pseudomembranous colitis has been reported with nearly all antibacterial agents, including UNASYN, and has ranged in severity from mild to life-threatening. Therefore, it is important to consider this diagnosis in patients who present with diarrhea subsequent to the administration of antibacterial agents.**

Treatment with antibacterial agents alters the normal flora of the colon and may permit overgrowth of clostridia. Studies indicate that toxin produced by *Clostridium difficile* is one primary cause of "antibiotic-associated colitis."

Mild cases of pseudomembranous colitis usually respond to drug discontinuation alone. In moderate to severe cases, consideration should be given to management with fluids and electrolytes, protein supplementation and treatment with an antibacterial drug clinically effective against *C. difficile* colitis.

## PRECAUTIONS

**General:** A high percentage of patients with mononucleosis who receive ampicillin develop a skin rash. Thus, ampicillin class antibiotics should not be administered to patients with mononucleosis. In patients treated with UNASYN the possibility of superinfections with mycotic or bacterial pathogens should be kept in mind during therapy. If superinfections occur (usually involving *Pseudomonas* or *Candida*), the drug should be discontinued and/or appropriate therapy instituted.

Prescribing UNASYN in the absence of proven or strongly suspected bacterial infection or a prophylactic indication is unlikely to provide benefit to the patient and increases the risk of the development of drug-resistant bacteria.

Information for Patients: Patients should be counseled that antibacterial drugs including UNASYN should only be used to treat bacterial infections. They do not treat viral infections (e.g., the common cold). When UNASYN is prescribed to treat a bacterial infection, patients should be told that although it is common to feel better early in the course of therapy, the medication should be taken exactly as directed. Skipping doses or not completing the full course of therapy may (1) decrease the effectiveness of the immediate treatment and (2) increase the likelihood that bacteria will develop resistance and will not be treatable by UNASYN or other antibacterial drugs in the future.

**Drug Interactions:** Probenecid decreases the renal tubular secretion of ampicillin and sulbactam. Concurrent use of probenecid with UNASYN may result in increased and prolonged blood levels of ampicillin and sulbactam. The concurrent administration of allopurinol and

ampicillin increases substantially the incidence of rashes in patients receiving both drugs as compared to patients receiving ampicillin alone. It is not known whether this potentiation of ampicillin rashes is due to allopurinol or the hyperuricemia present in these patients. There are no data with UNASYN and allopurinol administered concurrently. UNASYN and aminoglycosides should not be reconstituted together due to the *in vitro* inactivation of aminoglycosides by the ampicillin component of UNASYN.

**Drug/Laboratory Test Interactions:** Administration of UNASYN will result in high urine concentration of ampicillin. High urine concentrations of ampicillin may result in false positive reactions when testing for the presence of glucose in urine using Clinitest™, Benedict's Solution or Fehling's Solution. It is recommended that glucose tests based on enzymatic glucose oxidase reactions (such as Clinistix™ or Testape™) be used. Following administration of ampicillin to pregnant women, a transient decrease in plasma concentration of total conjugated estriol, estriol-glucuronide, conjugated estrone and estradiol has been noted. This effect may also occur with UNASYN.

**Carcinogenesis, Mutagenesis, Impairment of Fertility:** Long-term studies in animals have not been performed to evaluate carcinogenic or mutagenic potential.

**Pregnancy**
**Pregnancy Category B:** Reproduction studies have been performed in mice, rats, and rabbits at doses up to ten (10) times the human dose and have revealed no evidence of impaired fertility or harm to the fetus due to UNASYN. There are, however, no adequate and well controlled studies in pregnant women. Because animal reproduction studies are not always predictive of human response, this drug should be used during pregnancy only if clearly needed. (See– Drug/Laboratory Test Interactions.)

**Labor and Delivery:** Studies in guinea pigs have shown that intravenous administration of ampicillin decreased the uterine tone, frequency of contractions, height of contractions, and duration of contractions. However, it is not known whether the use of UNASYN in humans during labor or delivery has immediate or delayed adverse effects on the fetus, prolongs the duration of labor, or increases the likelihood that forceps delivery or other obstetrical intervention or resuscitation of the newborn will be necessary.

**Nursing Mothers:** Low concentrations of ampicillin and sulbactam are excreted in the milk; therefore, caution should be exercised when UNASYN is administered to a nursing woman.

**Pediatric Use:** The safety and effectiveness of UNASYN have been established for pediatric patients one year of age and older for skin and skin structure infections as approved in adults. Use of UNASYN in pediatric patients is supported by evidence from adequate and well-controlled studies in adults with additional data from pediatric pharmacokinetic studies, a controlled clinical trial conducted in pediatric patients and post-marketing adverse events surveillance. (See **CLINICAL PHARMACOLOGY, INDICATIONS AND USAGE, ADVERSE REACTIONS, DOSAGE AND ADMINISTRATION, and CLINICAL STUDIES** sections.)

9

The safety and effectiveness of UNASYN have not been established for pediatric patients for intra-abdominal infections.

## ADVERSE REACTIONS

**Adult Patients:** UNASYN is generally well tolerated. The following adverse reactions have been reported.

### Local Adverse Reactions
Pain at IM injection site – 16%
Pain at IV injection site – 3%
Thrombophlebitis – 3%

### Systemic Adverse Reactions
The most frequently reported adverse reactions were diarrhea in 3% of the patients and rash in less than 2% of the patients.

Additional systemic reactions reported in less than 1% of the patients were: itching, nausea, vomiting, candidiasis, fatigue, malaise, headache, chest pain, flatulence, abdominal distension, glossitis, urine retention, dysuria, edema, facial swelling, erythema, chills, tightness in throat, substernal pain, epistaxis and mucosal bleeding.

**Pediatric Patients:** Available safety data for pediatric patients treated with UNASYN demonstrate a similar adverse events profile to those observed in adult patients. Additionally, atypical lymphocytosis has been observed in one pediatric patient receiving UNASYN.

### Adverse Laboratory Changes
Adverse laboratory changes without regard to drug relationship that were reported during clinical trials were:

*Hepatic:* Increased AST (SGOT), ALT (SGPT), alkaline phosphatase, and LDH.
*Hematologic:* Decreased hemoglobin, hematocrit, RBC, WBC, neutrophils, lymphocytes, platelets and increased lymphocytes, monocytes, basophils, eosinophils, and platelets.
*Blood Chemistry:* Decreased serum albumin and total proteins.
*Renal:* Increased BUN and creatinine.
*Urinalysis:* Presence of RBC's and hyaline casts in urine.

The following adverse reactions have been reported with ampicillin-class antibiotics and can also occur with UNASYN.

**Gastrointestinal:** Gastritis, stomatitis, black "hairy" tongue and enterocolitis. Onset of pseudomembranous colitis symptoms may occur during or after antibiotic treatment. (See WARNINGS.)

10

**Hypersensitivity Reactions:** Urticaria, erythema multiforme, and an occasional case of exfoliative dermatitis have been reported. These reactions may be controlled with antihistamines and, if necessary, systemic corticosteroids. Whenever such reactions occur, the drug should be discontinued, unless the opinion of the physician dictates otherwise. Serious and occasional fatal hypersensitivity (anaphylactic) reactions can occur with a penicillin. (See WARNINGS.)

**Hematologic:** In addition to the adverse laboratory changes listed above for UNASYN, agranulocytosis has been reported during therapy with penicillins. All of these reactions are usually reversible on discontinuation of therapy and are believed to be hypersensitivity phenomena. Some individuals have developed positive direct Coombs Tests during treatment with UNASYN, as with other beta-lactam antibiotics.

## OVERDOSAGE

Neurological adverse reactions, including convulsions, may occur with the attainment of high CSF levels of beta-lactams. Ampicillin may be removed from circulation by hemodialysis. The molecular weight, degree of protein binding and pharmacokinetics profile of sulbactam suggest that this compound may also be removed by hemodialysis.

## CLINICAL STUDIES

**Skin and Skin Structure Infections in Pediatric Patients:** Data from a controlled clinical trial conducted in pediatric patients provided evidence supporting the safety and efficacy of UNASYN for the treatment of skin and skin structure infections. Of 99 pediatric patients evaluable for clinical efficacy, 60 patients received a regimen containing intravenous UNASYN, and 39 patients received a regimen containing intravenous cefuroxime. This trial demonstrated similar outcomes (assessed at an appropriate interval after discontinuation of all antimicrobial therapy) for UNASYN- and cefuroxime-treated patients:

| Therapeutic Regimen | Clinical Success | Clinical Failure |
|---|---|---|
| UNASYN | 51/60 (85%) | 9/60 (15%) |
| Cefuroxime | 34/39 (87%) | 5/39 (13%) |

Most patients received a course of oral antimicrobials following initial treatment with intravenous administration of parenteral antimicrobials. The study protocol required that the following three criteria be met prior to transition from intravenous to oral antimicrobial therapy: 1) receipt of a minimum of 72 hours of intravenous therapy; 2) no documented fever for prior 24 hours; and 3) improvement or resolution of the signs and symptoms of infection.

The choice of oral antimicrobial agent used in this trial was determined by susceptibility testing of the original pathogen, if isolated, to oral agents available. The course of oral antimicrobial therapy should not routinely exceed 14 days.

## DOSAGE AND ADMINISTRATION

UNASYN may be administered by either the IV or the IM routes.

For IV administration, the dose can be given by slow intravenous injection over at least 10-15 minutes or can also be delivered, in greater dilutions with 50-100 mL of a compatible diluent as an intravenous infusion over 15-30 minutes.

UNASYN may be administered by deep intramuscular injection. (See Preparation for Intramuscular Injection.)

The recommended adult dosage of UNASYN is 1.5 g (1 g ampicillin as the sodium salt plus 0.5 g sulbactam as the sodium salt) to 3 g (2 g ampicillin as the sodium salt plus 1 g sulbactam as the sodium salt) every six hours. This 1.5 to 3 g range represents the total of ampicillin content plus the sulbactam content of UNASYN, and corresponds to a range of 1 g ampicillin/0.5 g sulbactam to 2 g ampicillin/1 g sulbactam. The total dose of sulbactam should not exceed 4 grams per day.

**Pediatric Patients 1 Year of Age or Older:** The recommended daily dose of UNASYN in pediatric patients is 300 mg per kg of body weight administered via intravenous infusion in equally divided doses every 6 hours. This 300 mg/kg/day dosage represents the total ampicillin content plus the sulbactam content of UNASYN, and corresponds to 200 mg ampicillin/100 mg sulbactam per kg per day. The safety and efficacy of UNASYN administered via intramuscular injection in pediatric patients have not been established. Pediatric patients weighing 40 kg or more should be dosed according to adult recommendations, and the total dose of sulbactam should not exceed 4 grams per day. The course of intravenous therapy should not routinely exceed 14 days. In clinical trials, most children received a course of oral antimicrobials following initial treatment with intravenous UNASYN. (See **CLINICAL STUDIES** section.)

**Impaired Renal Function**

In patients with impairment of renal function the elimination kinetics of ampicillin and sulbactam are similarly affected, hence the ratio of one to the other will remain constant whatever the renal function. The dose of UNASYN in such patients should be administered less frequently in accordance with the usual practice for ampicillin and according to the following recommendations:

### UNASYN Dosage Guide For Patients With Renal Impairment

| Creatinine Clearance (mL/min/1.73m$^2$) | Ampicillin/Sulbactam Half-Life (Hours) | Recommended UNASYN Dosage |
|---|---|---|
| ≥30 | 1 | 1.5-3.0 g q 6h-q 8h |
| 15-29 | 5 | 1.5-3.0 g q 12h |
| 5-14 | 9 | 1.5-3.0 g q 24h |

When only serum creatinine is available, the following formula (based on sex, weight, and age of the patient) may be used to convert this value into creatinine clearance. The serum creatinine should represent a steady state of renal function.

Males $$\frac{\text{weight (kg)} \times (140 - \text{age})}{72 \times \text{serum creatinine}}$$

Females    $0.85 \times$ above value

## COMPATIBILITY, RECONSTITUTION AND STABILITY
UNASYN sterile powder is to be stored at or below 30°C (86°F) prior to reconstitution.

When concomitant therapy with aminoglycosides is indicated, UNASYN and aminoglycosides should be reconstituted and administered separately, due to the *in vitro* inactivation of aminoglycosides by any of the aminopenicillins.

## DIRECTIONS FOR USE
**General Dissolution Procedures:** UNASYN sterile powder for intravenous and intramuscular use may be reconstituted with any of the compatible diluents described in this insert. Solutions should be allowed to stand after dissolution to allow any foaming to dissipate in order to permit visual inspection for complete solubilization.

**Preparation for Intravenous Use**
1.5 g and 3.0 g Bottles: UNASYN sterile powder in piggyback units may be reconstituted directly to the desired concentrations using any of the following parenteral diluents. Reconstitution of UNASYN, at the specified concentrations, with these diluents provide stable solutions for the time periods indicated in the following table: (After the indicated time periods, any unused portions of solutions should be discarded.)

13

| Diluent | Maximum Concentration (mg/mL) UNASYN (Ampicillin/Sulbactam) | Use Periods |
|---|---|---|
| Sterile Water for Injection | 45 (30/15) | 8 hrs @ 25°C |
| | 45 (30/15) | 48 hrs @ 4°C |
| | 30 (20/10) | 72 hrs @ 4°C |
| 0.9% Sodium Chloride Injection | 45 (30/15) | 8 hrs @ 25°C |
| | 45 (30/15) | 48 hrs @ 4°C |
| | 30 (20/10) | 72 hrs @ 4°C |
| 5% Dextrose Injection | 30 (20/10) | 2 hrs @ 25°C |
| | 30 (20/10) | 4 hrs @ 4°C |
| | 3 (2/1) | 4 hrs @ 25°C |
| Lactated Ringer's Injection | 45 (30/15) | 8 hrs @ 25°C |
| | 45 (30/15) | 24 hrs @ 4°C |
| M/6 Sodium Lactate Injection | 45 (30/15) | 8 hrs @ 25°C |
| | 45 (30/15) | 8 hrs @ 4°C |
| 5% Dextrose in 0.45% Saline | 3 (2/1) | 4 hrs @ 25°C |
| | 15 (10/5) | 4 hrs @ 4°C |
| 10% Invert Sugar | 3 (2/1) | 4 hrs @ 25°C |
| | 30 (20/10) | 3 hrs @ 4°C |

If piggyback bottles are unavailable, standard vials of UNASYN sterile powder may be used. Initially, the vials may be reconstituted with Sterile Water for Injection to yield solutions containing 375 mg UNASYN per mL (250 mg ampicillin/125 mg sulbactam per mL). An appropriate volume should then be immediately diluted with a suitable parenteral diluent to yield solutions containing 3 to 45 mg UNASYN per mL (2 to 30 mg ampicillin/1 to 15 mg sulbactam/per mL).

1.5 g ADD-Vantage® Vials: UNASYN in the ADD-Vantage® system is intended as a single dose for intravenous administration after dilution with the ADD-Vantage® Flexible Diluent Container containing 50 mL, 100 mL or 250 mL of 0.9% Sodium Chloride Injection, USP.

3 g ADD-Vantage® Vials: UNASYN in the ADD-Vantage® system is intended as a single dose for intravenous administration after dilution with the ADD-Vantage® Flexible Diluent Container containing 100 mL or 250 mL of 0.9% Sodium Chloride Injection, USP.

UNASYN in the ADD-Vantage® system is to be reconstituted with 0.9% Sodium Chloride Injection, USP only. See INSTRUCTIONS FOR USE OF THE ADD-Vantage® VIAL. Reconstitution of UNASYN, at the specified concentration, with 0.9% Sodium Chloride Injection, USP provides stable solutions for the time period indicated below:

| | Maximum Concentration (mg/mL) | |
|---|---|---|
| **Diluent** | **UNASYN (Ampicillin/Sulbactam)** | **Use Period** |
| 0.9% Sodium Chloride Injection | 30 (20/10) | 8 hrs @ 25°C |

**In 0.9% Sodium Chloride Injection, USP**
The final diluted solution of UNASYN should be completely administered *within 8 hours* in order to assure proper potency.

**Preparation for Intramuscular Injection**
**1.5 g and 3.0 g Standard Vials:** Vials for intramuscular use may be reconstituted with Sterile Water for Injection USP, 0.5% Lidocaine Hydrochloride Injection USP or 2% Lidocaine Hydrochloride Injection USP. Consult the following table for recommended volumes to be added to obtain solutions containing 375 mg UNASYN per mL (250 mg ampicillin/125 mg sulbactam per mL). Note: *Use only freshly prepared solutions and administer within one hour after preparation.*

| UNASYN Vial Size | Volume of Diluent to be Added | Withdrawal Volume* |
|---|---|---|
| 1.5 g | 3.2 mL | 4.0 mL |
| 3.0 g | 6.4 mL | 8.0 mL |

*There is sufficient excess present to allow withdrawal and administration of the stated volumes.

**Animal Pharmacology:** While reversible glycogenosis was observed in laboratory animals, this phenomenon was dose- and time-dependent and is not expected to develop at the therapeutic doses and corresponding plasma levels attained during the relatively short periods of combined ampicillin/sulbactam therapy in man.

## HOW SUPPLIED

UNASYN® (ampicillin sodium/sulbactam sodium) is supplied as a sterile off-white dry powder in glass vials and piggyback bottles. The following packages are available:

Vials containing 1.5 g (NDC 0049-0013-83) equivalent of UNASYN (1 g ampicillin as the sodium salt plus 0.5 g sulbactam as the sodium salt)

Vials containing 3 g (NDC 0049-0014-83) equivalent of UNASYN (2 g ampicillin as the sodium salt plus 1 g sulbactam as the sodium salt)

Bottles containing 1.5 g (NDC 0049-0022-83) equivalent of UNASYN (1 g ampicillin as the sodium salt plus 0.5 g sulbactam as the sodium salt)

Bottles containing 3 g (NDC 0049-0023-83) equivalent of UNASYN (2 g ampicillin as the sodium salt plus 1 g sulbactam as the sodium salt)

Pharmacy Bulk Package containing 15 g (NDC 0049-0024-28) equivalent of UNASYN (10 g ampicillin as the sodium salt plus 5 g sulbactam as the sodium salt)

ADD-Vantage® vials containing 1.5 g (NDC 0049-0031-83) equivalent of UNASYN (1 g ampicillin as the sodium salt plus 0.5 g sulbactam as the sodium salt) are distributed by Pfizer Inc.

ADD-Vantage® vials containing 3 g (NDC 0049-0032-83) equivalent of UNASYN (2 g ampicillin as the sodium salt plus 1 g sulbactam as the sodium salt) are distributed by Pfizer Inc.

The 1.5 g UNASYN ADD-Vantage® vials are only to be used with Abbott Laboratories' ADD-Vantage® Flexible Diluent Container containing 0.9% Sodium Chloride Injection, USP, 50 mL, 100 mL, or 250 mL sizes.

The 3 g UNASYN ADD-Vantage® vials are only to be used with Abbott Laboratories' ADD-Vantage® Flexible Diluent Container containing 0.9% Sodium Chloride Injection, USP, 100 mL or 250 mL sizes.

## INSTRUCTIONS FOR USE OF THE ADD-Vantage® VIAL

**To Open Diluent Container:** Peel overwrap from the corner and remove container. Some opacity of the plastic due to moisture absorption during the sterilization process may be observed. This is normal and does not affect the solution quality or safety. The opacity will diminish gradually.

### To Assemble Vial and Flexible Diluent Container: (Use Aseptic Technique)

1. Remove the protective covers from the top of the vial and the vial port on the diluent container as follows:

a. To remove the breakaway vial cap, swing the pull ring over the top of the vial and pull down far enough to start the opening (see Figure 1), pull the ring approximately half way around the cap and then pull straight up to remove the cap (see Figure 2).

NOTE: Do not access vial with syringe.



**Fig. 1**



**Fig. 2**

16

b. To remove the vial port cover, grasp the tab on the pull ring, pull up to break the three tie strings, then pull back to remove the cover. (See Figure 3.)

2. Screw the vial into the vial port until it will go no further. THE VIAL MUST BE SCREWED IN TIGHTLY TO ASSURE A SEAL. This occurs approximately 1/2 turn (180°) after the first audible click. (See Figure 4.) The clicking sound does not assure a seal, the vial must be turned as far as it will go.

NOTE: Once vial is sealed, do not attempt to remove. (See Figure 4.)

3. Recheck the vial to assure that it is tight by trying to turn it further in the direction of assembly.

4. Label appropriately.

 **Fig. 3**        **Fig. 4**

17

**To Prepare Admixture**

1. Squeeze the bottom of the diluent container gently to inflate the portion of the container surrounding the end of the drug vial.

2. With the other hand, push the drug vial down into the container telescoping the walls of the container. Grasp the inner cap of the vial through the walls of the container. (See Figure 5.)

3. Pull the inner cap from the drug vial. (See Figure 6.) Verify that the rubber stopper has been pulled out, allowing the drug and diluent to mix.

4. Mix container contents thoroughly and use within the specified time.

 Fig. 5     Fig. 6

18

## REFERENCES

1. National Committee for Clinical Laboratory Standards, *Performance Standards for Antimicrobial Disk Susceptibility Tests*–Fourth Edition. Approved Standard NCCLS Document M2-A4, Vol. 10, No. 7 NCCLS, Villanova, PA, April 1990.

2. National Committee for Clinical Laboratory Standards, *Methods for Dilution Antimicrobial Susceptibility Tests for Bacteria that Grow Aerobically*, Second Edition. Approved Standard NCCLS Document M7-A2, Vol. 10, No. 8 NCCLS, Villanova, PA, April 1990.

**Rx only**                                                          **©2003 PFIZER INC**



**Roerig**
Division of Pfizer Inc, NY, NY 10017

70-4361-44-4                                        Revised September 2003

F
07-200
EGS

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

**I (a) PLAINTIFFS**

Lawrence Davis, Jr.,

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** 88888
**(EXCEPT IN U.S. PLAINTIFF CASES)**

Pro Se (PR)

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
# 13158-007

**DEFENDANTS**

District of Columbia, et al,

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TI

CASE NUMBER: 1:07CV00200

JUDGE: Emmet G. Sullivan

DECK TYPE: Pro se General Civil

DATE STAMP: 01/30/2007

JURY ACTION

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

(☑) 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENS FOR PLAINTIFF**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

**☐ A. Antitrust**

☐ 410 Antitrust

**☐ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**☐ E. General Civil (Other) OR (☑) F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
(☑) 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ☐ **G.** *Habeas Corpus/ 2255*<br><br>☐ **530 Habeas Corpus-General**<br>☐ **510 Motion/Vacate Sentence** | ☐ **H.** *Employment Discrimination*<br><br>☐ **442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)**<br><br>*(If pro se, select this deck)* | ☐ **I.** *FOIA/PRIVACY ACT*<br><br>☐ **895 Freedom of Information Act**<br>☐ **890 Other Statutory Actions (if Privacy Act)**<br><br><br>*(If pro se, select this deck)* | ☐ **J.** *Student Loan*<br><br>☐ **152 Recovery of Defaulted Student Loans (excluding veterans)** |
|---|---|---|---|
| ☐ **K.** *Labor/ERISA (non-employment)*<br><br>☐ **710 Fair Labor Standards Act**<br>☐ **720 Labor/Mgmt. Relations**<br>☐ **730 Labor/Mgmt. Reporting & Disclosure Act**<br>☐ **740 Labor Railway Act**<br>☐ **790 Other Labor Litigation**<br>☐ **791 Empl. Ret. Inc. Security Act** | ☐ **L.** *Other Civil Rights (non-employment)*<br><br>☐ **441 Voting (if not Voting Rights Act)**<br>☐ **443 Housing/Accommodations**<br>☐ **444 Welfare**<br>☐ **440 Other Civil Rights**<br>☐ **445 American w/Disabilities-Employment**<br>☐ **446 Americans w/Disabilities-Other** | ☐ **M.** *Contract*<br><br>☐ **110 Insurance**<br>☐ **120 Marine**<br>☐ **130 Miller Act**<br>☐ **140 Negotiable Instrument**<br>☐ **150 Recovery of Overpayment & Enforcement of Judgment**<br>☐ **153 Recovery of Overpayment of Veteran's Benefits**<br>☐ **160 Stockholder's Suits**<br>☐ **190 Other Contracts**<br>☐ **195 Contract Product Liability**<br>☐ **196 Franchise** | ☐ **N.** *Three-Judge Court*<br><br>☐ **441 Civil Rights-Voting (if Voting Rights Act)** |

**V. ORIGIN**

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ Multi district Litigation ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 USC 1983

**VII. REQUESTED IN COMPLAINT** CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23   DEMAND $ 0   Check YES only if demanded in complaint JURY DEMAND: ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See instruction) ☐ YES ☒ NO If yes, please complete related case form.

DATE 1-30-07   SIGNATURE OF ATTORNEY OF RECORD NO

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

form/js-44.wpd